Argued and submitted November 7, 2011, affirmed in part, reversed in part, and remanded August 1, 2012

Lisa CATT
and Blanca Catt,
*Plaintiffs-Appellants,*

*v.*

DEPARTMENT OF HUMAN SERVICES,
on behalf of the State of Oregon;
Maria Dunn;
and Elizabeth Dillner,
*Defendants-Respondents,*

*and*

Judith SWANSON;
Kathryn Underhill;
and Juvenile Rights Project, Inc.,
*Defendants.*

Multnomah County Circuit Court
091014151; A146815

284 P3d 532

Mark Kramer argued the cause for appellants. With him on the briefs was Kramer & Associates.

Erin C. Lagesen, Assistant Attorney General, argued the cause for respondents. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

This civil dispute arises from a failure by the Department of Human Services (DHS) to secure permanent legal residency status and, consequently, United States citizenship for plaintiff Blanca Catt while she was in DHS's legal custody, and from DHS's false representations to Blanca's adoptive mother, plaintiff Lisa Catt, regarding Blanca's citizenship.[1] As relevant to this appeal, plaintiffs brought two claims against DHS and several of its employees[2] under the Oregon Torts Claims Act, one based on preadoption conduct by DHS—primarily the failure to process Blanca's permanent residency status properly—and the other based on post-adoption conduct—false representations regarding Blanca's American citizenship. DHS moved for summary judgment, arguing that (1) plaintiffs failed to timely provide DHS with their tort claims notice; (2) plaintiffs' claims were barred by the statute of limitations; and (3) plaintiffs' preadoption claim was barred by the statute of ultimate repose. DHS prevailed on all grounds. We conclude that there are genuine issues of fact for trial regarding whether plaintiffs timely served their tort claims notice and brought a portion of their post-adoption claim; however, we also conclude that plaintiffs' preadoption claim and parts of their post-adoption claim are barred by the statute of ultimate repose. We therefore affirm in part and reverse in part.

## I. FACTS

Because the trial court granted DHS's motion for summary judgment, we state the facts most favorably to plaintiffs, the nonmoving parties. *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997). Blanca was born in Mexico in 1990. In 1993, Blanca's birth parents or other relatives brought Blanca into the United States illegally from Mexico. Blanca was then abused by her biological mother, causing DHS to seek and to obtain custody of Blanca. DHS then placed Blanca in the foster care of Lisa and her then

---

[1] For clarity, we refer to the individual plaintiffs by their first names.

[2] Defendants on appeal include DHS employees Dunn and Dillner. We refer to defendants collectively as "DHS" unless the context requires otherwise. Other defendants unrelated to DHS were dismissed from the action before the summary judgment proceedings at issue.

husband. On October 23, 1996, an Oregon court terminated the parental rights of Blanca's biological parents, a decision partly based on findings that Blanca had suffered serious abuse in their care.

While Blanca was in foster care, defendant Dunn was the primary DHS caseworker assigned to Blanca's case. Defendant Dillner was the DHS caseworker responsible for pursuing Blanca's American citizenship. On behalf of Blanca, and while DHS was responsible for her care, Dillner prepared and submitted two forms, an I-360 Petition for Special Immigrant and an I-485 Application to Register Permanent Resident or Adjust Status, to the former Immigration and Naturalization Service (INS), currently known as the United States Citizenship and Immigration Services (USCIS). Dillner filed the applications with INS to establish Blanca's legal residency in the United States, a prerequisite for citizenship. Unfortunately, DHS's attempt to file the legal residency applications was unsuccessful because of mistakes by DHS employees.

Once the parental rights of Blanca's biological parents were terminated, Lisa and her then husband sought to adopt Blanca. Lisa requested that DHS complete the citizenship process for Blanca before the adoption was finalized. Though DHS had been unable to secure citizenship for Blanca, it informed Lisa that Blanca could establish citizenship either through adoption or a court order identifying permanent foster care for Blanca as the permanency plan. While Lisa was Blanca's foster parent, DHS advised Lisa that Blanca would automatically obtain citizenship once Blanca was adopted because her adoptive parents, Lisa and her then husband, were United States citizens. At no point did DHS explain to Lisa that any further steps were necessary for Blanca to become a citizen.

In May 1999, Blanca's adoption was finalized. Blanca was then eight years old.

In 2000, DHS represented to Lisa that, because of the passage of the Child Citizenship Act of 2000 (CCA), codified in relevant part at 8 USC sections 1431 and 1433, Blanca would automatically become a citizen through

her 1999 adoption.[3] DHS also explained to Lisa that, if Blanca needed proof of her citizenship, then Blanca's new birth certificate, evidence of Lisa's and her then husband's citizenship, and the adoption decree would be sufficient under the CCA. Based on DHS's representations, Lisa and Blanca assumed that Blanca was a United States citizen since her adoption.

In 2006, Blanca applied for a driver's permit, but her application was denied because her Social Security card had her former last name instead of Catt. Blanca sought to update her Social Security record and to obtain a new card with the name Catt, but the Social Security Administration denied her request because Blanca's adoption certificate and adoption judgment were insufficient proof of her citizenship.

To obtain adequate proof of Blanca's citizenship, Lisa filed an N-600 Application for Certificate of Citizenship with USCIS in February 2007. USCIS sent Blanca a letter dated August 2, 2007, denying her request for a certificate of citizenship because Blanca's original entry into the United States was illegal and Blanca was never lawfully admitted to the United States as a permanent resident.[4] According to USCIS's letter, to obtain United States citizenship for Blanca, Lisa would be required to file an I-130 Petition for Alien Relative, so that Blanca would first become a lawful

---

[3] Section 320 of the CCA provides:

"(a) A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:

"(1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.

"(2) The child is under the age of eighteen years.

"(3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

"(b) Subsection (a) of this section shall apply to a child adopted by a United States citizen parent if the child satisfies the requirements applicable to adopted children under section 1101(b)(1)."

8 USC § 1431. Thus, if Blanca had been lawfully admitted for permanent residency, she would have been eligible for citizenship automatically after the enactment of the CCA.

[4] The August 2007 letter incorrectly stated that Blanca's "Application for Citizenship" was denied when the application was actually for a *certificate* of citizenship, not an application for citizenship.

permanent resident, a prerequisite to citizenship. After receiving USCIS's letter, Lisa believed that "it was only a matter of paperwork, fees, and time to establish Blanca as a citizen" and it was her "job *** to correctly process the paperwork that DHS failed to do correctly."

On or around November 6, 2007, Lisa filed an I-130 form with USCIS to request permanent resident status for Blanca. Because the I-130 form allowed Lisa to petition on behalf of Blanca until Blanca turned 21 years old, Lisa was unaware that, if Blanca's immigration forms were not processed before Blanca turned 18 years old, she would be subject to "penalties." Sometime after June 2009, Lisa was approved to act as Blanca's agent for her immigrant visa petition, and Lisa paid the fees required for the immigrant visa in September 2009. At that time, Lisa continued to believe that it was "just a matter of time and more paperwork before Blanca would get an immigrant visa."

Also in September 2009, for the first time, Lisa contacted immigration attorneys to assist her with Blanca's immigrant visa application. An immigration attorney advised Lisa that, because Blanca was over 18 years old and considered an illegal alien, she would need to leave the United States and remain in Mexico for a minimum of three years until a visa was issued to her. The immigration attorney also advised Lisa that, after Blanca turned 19 years old in October 2009, the three-year bar to reenter the United States would increase to 10 years.

## II. PROCEDURAL HISTORY

On October 6, 2009, plaintiffs sent DHS a tort claims notice that alleged that DHS and its agents had acted negligently and attached a copy of a complaint; DHS received the notice. Plaintiffs filed their complaint in the Multnomah County Circuit Court on October 7, 2009, before Blanca's nineteenth birthday.

Plaintiffs brought two separate claims for negligence against DHS.[5] First, in plaintiffs' preadoption negligence

---

[5] In their complaint, plaintiffs allege a single claim of negligence, but the parties and the trial court have treated it as two separate claims.

claim, as stated in their second amended complaint, they alleged that DHS owed a special duty to plaintiffs and breached that duty when DHS (1) "fail[ed] to properly process Blanca's permanent residency documentation such that Blanca would become a permanent resident of the United States as a Special Immigrant Juvenile[ ] * * *"; (2) "fail[ed] to properly and timely refile" Blanca's permanent residency documentation; (3) "fail[ed] to advise [Lisa] and Blanca * * * of the consequences of [DHS's] failure to obtain permanent residency status for Blanca"; (4) "fail[ed] to advise [Lisa] and Blanca to seek permanent residency status for Blanca before she attained the age of 18"; and (5) made "false representations as to Blanca's citizenship status." In their post-adoption negligence claim, plaintiffs alleged that DHS was similarly negligent after the adoption was final, with only slight variations from the allegations in their preadoption claim: (1) instead of alleging that DHS failed to properly process the permanent residency documents, plaintiffs alleged that DHS failed to determine whether the applications were successful; (2) instead of alleging that DHS failed to advise plaintiffs of the consequences of the failure to obtain legal permanent residency for Blanca, plaintiffs alleged that DHS failed to tell plaintiffs about the failure; and (3) plaintiffs alleged that DHS also made false representations about Blanca's permanent residency status and her citizenship.

DHS moved for summary judgment, providing three separate arguments as to why plaintiffs' claims for relief fail as a matter of law. First, DHS argued that plaintiffs failed to timely provide their tort claims notice as required by ORS 30.275. Second, DHS argued that plaintiffs' claims for relief are barred by the statute of limitations. DHS asserted that plaintiffs' action accrued on August 2, 2007, when Lisa received the letter from USCIS indicating that Blanca was not a citizen, and that plaintiffs waited too long—until October 2009, over two years later—to provide notice and file their action. Lastly, DHS argued that plaintiffs' preadoption claim for relief was barred by the statute of ultimate repose, because DHS's alleged negligence occurred more than 10 years before plaintiffs filed their complaint.

The trial court issued three separate letter opinions in response to DHS's motion for summary judgment. In its first letter opinion, the trial court granted DHS's motion for summary judgment on both claims after concluding that, once USCIS had sent the August 2, 2007, letter to Blanca denying her request for certificate of citizenship and plaintiffs had received it, "plaintiffs discovered that defendants were responsible for the injuries that plaintiffs had suffered" and this was sufficient "to trigger the tort claim notice and statute of limitations periods." The trial court also concluded, alternatively, that plaintiffs' preadoption claim was barred by the statute of ultimate repose.

Plaintiffs asked the trial court to reconsider its rulings. They argued that, even if plaintiffs had discovered their injury in August 2007, Blanca's tort claims notice was timely because ORS 12.160 tolls claims for minors. Before the trial court entered judgment consistently with its first letter opinion, the court issued a second letter opinion, ruling that Blanca's preadoption claim survived because she filed her complaint before the limitations period had expired, and Blanca was not required to provide DHS with a tort claims notice for its actions while she was in the state's custody. However, the court did not address whether the statute of ultimate repose applied. In the trial court's third letter opinion, it determined that the statute of ultimate repose barred plaintiffs' preadoption claim. The trial court then granted DHS's motion for summary judgment and entered a general judgment dismissing all of plaintiffs' claims.

## III.  ANALYSIS

On appeal, plaintiffs assign as error the trial court's ruling granting summary judgment in favor of DHS. We apply the familiar standard of review: summary judgment is appropriate if there is no genuine issue of material fact for trial, and the moving party is entitled to judgment as a matter of law. ORCP 47 C; *Brehm v. Caterpillar, Inc.*, 235 Or App 274, 278, 231 P3d 797, *rev den,* 349 Or 245 (2010).

"There is no genuine issue of material fact if, 'based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment.'"

*Brehm,* 235 Or App at 278 (quoting ORCP 47 C). And if there is no issue of material fact in dispute, we review the trial court's ruling for errors of law. *Oregon Southwest, LLC v. Kvaternik,* 214 Or App 404, 413, 164 P3d 1226 (2007), *rev den,* 344 Or 390 (2008).

Plaintiffs reprise their three major arguments in the trial court on appeal. First, they argue that they gave timely notice of their tort claims. Blanca contends that the time period for giving notice was tolled for her until she turned 19 years old, and both plaintiffs argue that they discovered an actionable injury in September 2009, once they learned that Blanca was required to leave the United States and to remain in Mexico for years before a visa allowing her to reside in the United States could be issued to her. Second, plaintiffs argue that they timely commenced their action against DHS, arguing that, under the discovery rule, they filed their complaint within two years of discovering their actionable injury in September 2009. Plaintiffs contend that, at least, issues of material fact exist for trial as to when plaintiffs discovered the existence of an actionable injury. Lastly, plaintiffs assert that the statute of ultimate repose did not bar plaintiffs' preadoption claim because DHS had a continuing duty to establish Blanca as a citizen until she turned 18 years old. Plaintiffs also assert that an "active, continuous relationship" of trust existed between DHS and plaintiffs until Blanca turned 18 years old and that that relationship inhibited plaintiffs from timely recognizing the existence of their claims, thereby tolling the application of the statute of ultimate repose. We address plaintiffs' arguments in turn.

A.  *Timeliness of the Tort Claims Notice*

The Oregon Tort Claims Act (OTCA) requires that a person seeking to file an action against a public body provide timely notice of his or her intent to do so. ORS 30.275. That section of the OTCA provides, in part:

> "(1)  No action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of ORS 30.260 to 30.300 shall be maintained unless notice of claim is given as required by this section.

"(2) Notice of claim shall be given within the following applicable period of time, *not including the period, not exceeding 90 days, during which the person injured is unable to give the notice* because of the injury or *because of minority*, incompetency or other incapacity:

"(a) For wrongful death, within one year after the alleged loss or injury.

"(b) *For all other claims, within 180 days after the alleged loss or injury.*

"\* \* \* \* \*

"(8) The requirement that a notice of claim be given under subsections (1) to (7) of this section does not apply if:

"(a)(A) The claimant was under the age of 18 years when the acts or omissions giving rise to a claim occurred;

"(B) The claim is against the Department of Human Services or the Oregon Youth Authority; and

"(C) The claimant was in the custody of the Department of Human Services pursuant to an order of a juvenile court under ORS 419B.150, 419B.185, 419B.337 or 419B.527, or was in the custody of the Oregon Youth Authority under the provisions of ORS 419C.478, 420.011 or 420A.040, when the acts or omissions giving rise to a claim occurred."

ORS 30.275 (emphasis added). The purpose of the notice period is to allow "the public body to investigate the claim while the evidence is still fresh and allow[] the public body speedily to correct the defect, if any, out of which the claim allegedly arose." *Perez v. Bay Area Hospital*, 315 Or 474, 482, 846 P2d 405 (1993).

Under the OTCA, the applicable notice period depends on whether the injured person seeking to bring an action against a public body or employee is an adult or a minor. A competent adult plaintiff must provide notice of a claim within 180 days of the actionable injury; however, this 180-day notice period is extended for minors for a period "not exceeding 90 days, during which the person injured is unable to give the notice \* \* \* because of minority[.]" ORS 30.275(2). Thus, according to the plain language of ORS 30.275(2), minors have 270 days after the discovery of their alleged injury or loss to give the public body or employee

notice of tort claims. *See also Perez*, 315 Or at 483 (holding that notice of a child's claim was untimely when not provided within 270 days after alleged loss or injury, even though the child had no guardian *ad litem*). Blanca, however, initially contends that ORS 30.275(2) does not govern in her case.

### 1. *Tolling based on Blanca's minority*

Blanca contends that the period for a minor to provide a notice of tort claims under the OTCA is controlled by ORS 12.160, a tolling provision concerning the time for persons under a disability to bring a tort action, rather than ORS 30.275(2). In part, ORS 12.160 provides:

> "(1) Subject to subsection (2) of this section, if a person is entitled to bring an action that is subject to the statutes of limitation prescribed by ORS 12.010 to 12.050, 12.070 to 12.250 or 12.276, and at the time the cause of action accrues the person is a child who is younger than 18 years of age, *the statute of limitation for commencing the action is tolled for so long as the person is younger than 18 years of age.*

> "(2) The time for commencing an action may not be extended under subsection (1) of this section for *more than five years, or for more than one year after the person attains 18 years* of age, whichever occurs first."

(Emphasis added.) Although Blanca's claims are subject to the statute of limitations in the OTCA for bringing most claims against a public body or public officers and employees, ORS 30.275(9), Blanca contends that the emphasized text in ORS 12.160 establishes that the tort claims notice period was tolled until she turned 19 years old, by which time she had provided DHS notice of her post-adoption claim.[6] Blanca relies primarily on *Baker v. City of Lakeside*, 343 Or 70, 82-83, 164 P3d 259 (2007), for support.

*Baker* concerned whether, in amending the OTCA in 1981, the legislature intended to exempt claims under

---

[6] The trial court ruled, and it is undisputed on appeal, that Blanca was not required to give DHS a tort claims notice for her preadoption claim, because all of the requirements for dispensing with notice in ORS 30.275(8) are met in this case: Blanca was under the age of 18 when the claimed negligence occurred, the claim is against DHS, and she was in DHS's custody at the time of the negligent acts. Thus, the parties dispute whether Blanca's tort claims notice was timely only as to her post-adoption claim.

the OTCA from the rule that an action is commenced on the day the complaint is filed if the plaintiff serves process on the defendant within 60 days. 343 Or at 72. From *Baker*, Blanca concludes that ORS 12.160 tolls the time for commencing an action against a public body until the sooner of two events, which in this case is "one year after the person attains 18 years of age." *See id.* at 82 (stating in *dicta* that claims subject to the two-year limitations period in the OTCA would be tolled for minors under ORS 12.160). She then argues that, just as the limitations period in ORS 30.275(9) is tolled for minors pursuant to ORS 12.160, the legislature intended tolling of the time for providing a tort claims notice, which is a prerequisite to her action against DHS. Blanca suggests that, without parallel tolling of the time for providing a tort claims notice, the tolling of the limitations period for minors often is, practically speaking, meaningless. Thus, Blanca concludes, because the time for filing a tort claims notice was tolled until she turned 19 years old, her notice to DHS was timely.

At the same time, Blanca attempts to distinguish *Perez*, a case concerning whether the 270-day notice period provided in ORS 30.275(2) was tolled until the appointment of a guardian *ad litem* for the injured minor. Although the Supreme Court concluded that the purpose of allowing minors to have an extra 90 days to provide notice of tort claims "is to recognize a minor's legal disability and permit the appointment of a guardian *ad litem*," 315 Or at 482, it concluded that, to give meaning to the 90-day extension, the 270-day period is not tolled indefinitely pending the appointment of a guardian *ad litem*. *Id.* at 483. Consequently, the minor's notice in *Perez* was untimely. *Id.* Blanca argues that *Perez* does not control this case because the court did not consider the inconsistency between a 270-day notice period in the OTCA, regardless of the minor's age at the time of injury, and ORS 12.160, which tolls the limitations period for a minor to commence a tort action until up to one year after the minor attains the age of 18 years.

We agree with DHS that, even if there is some inconsistency between ORS 30.275(2) and ORS 12.160, the legislature expressly specified in the OTCA that the notice period is tolled for a period "not exceeding" 90 days due to

minority. Nothing in the text of that statutory provision suggests that an additional tolling period will apply for minors. In addition to the specificity of the OTCA, the purpose of the notice requirement, recognized in *Perez*, 315 Or at 482, supports application of the relatively short 270-day notice period.

We also note that the Supreme Court has previously described the interplay between ORS 30.275(2) and ORS 12.160. In *Bradford v. Davis*, 290 Or 855, 861-62, 626 P2d 1376 (1981), the court described the time requirement for providing notice of claims under the OTCA as being independent of the extension of time allowed to minors to commence an action under ORS 12.160:

> "It is consistent with the remedial policy of the Tort Claims Act to assume that the legislature meant to assure local governments of an early opportunity to investigate claims even by minors, but that thereafter the extension of time to commence an action generally provided to minors and incapacitated persons by ORS 12.160 would apply to the same kinds of actions when brought against a public defendant."

Accordingly, we conclude that, under ORS 30.275(2), minors are required to give notice of a tort claim to a public body and its employees within 270 days of the discovery of their alleged injuries, and ORS 12.160 does not toll this notice period.

### 2. *Tolling based on the discovery rule*

Having decided that ORS 12.160 did not toll the period for Blanca to provide a tort claims notice to DHS for her post-adoption claim, we turn, next, to plaintiffs' argument that both Blanca's and Lisa's tort claims notice periods were tolled by the discovery rule. As previously noted, the 180-day notice period for adults, and the 270-day notice period for minors, begins to run from the date of the "alleged loss or injury." ORS 30.275(2). This accrual date, however, can be tolled under the discovery rule. *Adams v. Oregon State Police*, 289 Or 233, 238, 611 P2d 1153 (1980).

Under the discovery rule, the notice period begins to run when "the plaintiff *knows* or, in the exercise of reasonable care *should know*, facts that would make an objectively

reasonable person aware of a substantial possibility that *** an injury occurred, the injury harmed one or more of the plaintiff's legally protected interests, and the defendant is the responsible party." *Edwards v. DHS*, 217 Or App 188, 197, 175 P3d 490 (2007) (internal quotation marks and citations omitted; emphasis added). The question of whether a plaintiff, in the exercise of reasonable care, should have discovered that she was injured by the tortious act of another is ordinarily a "factual question for determination by a jury." *Kaseberg v. Davis Wright Tremaine, LLP*, 351 Or 270, 278, 265 P3d 777 (2011); *see Stevens v. Bispham*, 316 Or 221, 228, 851 P2d 556 (1993) ("Depending on the case, the question of when harm occurs may be a question of fact or a question of law.").

The trial court concluded as a matter of law that plaintiffs discovered their injury in August 2007, upon their receipt of the letter from USCIS. The question before us, then, is whether a reasonable jury could conclude that plaintiffs discovered or should have discovered a legally cognizable injury—*i.e.*, harm, causation, and tortious conduct—within 180 days (Lisa) or 270 days (Blanca) of their providing their tort claims notice to DHS in October 2009. On appeal, the parties dispute what constitutes plaintiffs' harm and when plaintiffs discovered or should have discovered that harm.

In DHS's view, the harm plaintiffs alleged that they suffered was Blanca's lack of legal permanent resident status and United States citizenship. DHS asserts that plaintiffs were actually aware that they suffered their harm when they received the August 2007 letter from USCIS informing them that "Blanca [was] not a citizen or legal permanent resident of the United States[,]" making plaintiffs' tort claims notice untimely.[7]

Plaintiffs argue that, although they became aware that Blanca was not a legal permanent resident or citizen

---

[7] In part of their response, plaintiffs argue that the trial court erred when it imputed Lisa's knowledge of the August 2007 letter to Blanca. Plaintiffs contend that Blanca was 17 years old when the letter was received and that there is nothing in the record to suggest that Blanca read the letter or understood the consequences resulting from the information in the letter. However, the letter from USCIS was addressed to Blanca, and, contrary to plaintiffs' assertion, Lisa's affidavit affirmatively states that Blanca was aware that she was not a citizen of the United States after she received the August 2007 letter.

when they received the August 2007 letter, they were not aware of their harm until they were informed by the immigration attorney, in September 2009, that Blanca was unable to become a permanent resident—a requirement for citizenship—without leaving the United States and remaining in Mexico for three years, initially, and then 10 years once Blanca turned 19 years old. In other words, in plaintiffs' view, the harm to which DHS subjected plaintiffs was the prospect of Blanca's removal and exclusion from this country and separation from her home and family for at least a decade before she could become a legal permanent resident. In light of that harm, plaintiffs contend that, at the very least, the date by which they were obligated to provide a tort claims notice to DHS is a jury question. DHS's rejoinder is that, although plaintiffs were further harmed by Blanca being required to leave the United States once she reached the age of majority, that is not a separate actionable harm.

Although we agree with DHS that, in part, plaintiffs alleged that Blanca's lack of citizenship, stemming from the failed application for legal permanent resident status, was a harm, we agree with plaintiffs that this case involves a different harm as well. In their complaint, plaintiffs alleged two different harms. One was to Blanca's right to citizenship and a second harm was to Blanca's right to remain in the United States, without being subjected to deportation proceedings, without being required to travel to Mexico to apply for an immigrant visa, and without being subjected to exclusion from this country for a decade or more to obtain legal permanent residency.

With regard to the first type of harm, plaintiffs alleged that, had DHS properly filed the I-360 and I-485 forms, Blanca would have become a permanent resident and her initial illegal entry into the United States when she was three years old would have been waived. That, in turn, would have allowed her to become a United States citizen immediately had she applied for naturalized citizenship before she reached age 18. Plaintiffs alleged economic harm, including the legal expenses for immigration counsel and the financial consequences of Blanca's inability to be

lawfully employed or to receive financial aid to go to college, and extreme emotional distress as a result.

But plaintiffs also alleged that DHS's initial improper filing of Blanca's permanent residency documents (and failure to refile them) and its misleading of Lisa subjected Blanca to "the necessity of departing [from] the United States" and "the 10-year bar to reentry to the United States" when she does so. Plaintiffs alleged that they suffered extreme emotional distress due to the fear and uncertainty that came with Blanca's status as an illegal alien in the United States and the anguish that she would be subject to deportation to Mexico, exclusion from the United States, and lengthy separation from her home and family. In other words, as plaintiffs' expert explained, Blanca and Lisa were harmed because Blanca was subject to deportation and needed to depart and to remain outside the United States for at least 10 years in order to be allowed to return to the United States legally, absent a waiver based on extreme hardship. That is a separate actionable harm from Blanca's lack of citizenship. *Cf. Gaston v. Parsons*, 318 Or 247, 260, 864 P2d 1319 (1994) (informed consent claim against doctor was untimely because the plaintiff knew that he had not been informed that a risk of surgery was loss of use of his arm, but claim that doctor negligently performed surgery, although related to consent claim, involved a separate harm).

DHS also argues that plaintiffs merely allege that they suffered additional damages, relying on cases in which we have stated that a tort claim "'accrues from the date the injury is, or should have been discovered, not from the time the full extent of damages is ascertained.'" *Edwards*, 217 Or App at 198 (quoting *Raethke v. Oregon Health Sciences Univ.*, 115 Or App 195, 198, 837 P2d 977 (1992), *rev den*, 315 Or 442 (1993)). DHS's argument misses the mark, given our holding that plaintiffs alleged two different harms.

Based on plaintiffs' second theory of harm, a reasonable jury could easily find on this record that, when they received the letter from USCIS in 2007, neither plaintiff actually knew of the harm, that is, Blanca's possible removal and the requirement that she leave and remain outside this

country for at least a decade in order to enter legally. When plaintiffs received the letter, Lisa believed that "it was only a matter of paperwork, fees, and time to establish Blanca as a citizen" and that it was her "job * * * to correctly process the paperwork that DHS failed to do correctly."

As instructed by the USCIS letter, Lisa filed an I-130 Petition for Alien Relative to establish Blanca's permanent residency, applying for an adjustment of status, and later applied for an immigration visa. Lisa's application indicated that she believed that she could obtain an adjustment of Blanca's status. At that point, based on DHS's prior statements that Blanca was automatically a citizen once she was adopted, plaintiffs believed that it was a matter of paperwork to correct Blanca's citizenship status. Moreover, based on the Petition for Alien Relative, plaintiffs believed they could file that paperwork for Blanca until she turned 21. In her affidavit, Lisa stated, "I was not aware that there would be penalties for Blanca when she was no longer a minor as form I-130 (Petition for Alien Relative) allowed me to petition [for] my unmarried child up to age 21."

As previously noted, the August 2007 letter did not indicate that Blanca would have to leave the country if she was not a legal permanent resident before she turned 18 years old. The fact that the letter informed plaintiffs that Blanca was not a citizen or a legal resident does not necessarily imply that she would have to leave the country if she did not obtain legal residency by the age of 18. Lisa testified that, until September 2009, when she contacted the immigration attorney, she did not understand that (1) "Blanca would be subject to a 3-year, and later a 10-year exclusion if citizenship paperwork was not processed by her attaining age 18 or 19"; and (2) even if Blanca did leave the country for the minimum period of time, "there was no guarantee that the * * * government would actually issue Blanca a visa." Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could conclude that they were unaware of their harm until September 2009, when Lisa obtained immigration counsel.

Although DHS focuses on plaintiffs' actual knowledge of cognizable harm in 2007, to the extent that DHS contends that plaintiffs should have discovered their claims by seeking legal advice about the consequences of Blanca's lack of legal permanent resident status and citizenship once they received the letter in 2007, we conclude that is an issue of fact for trial as well. Whether the plaintiff has a duty to inquire about facts that might disclose the existence of an actionable injury at any particular point in time is, generally, a factual question for the jury. *Cole v. Sunnyside Marketplace, LLC*, 212 Or App 509, 521, 160 P3d 1 (2007), *rev den*, 344 Or 558 (2008). When a plaintiff has a duty to inquire, the jury must determine the point in time when the plaintiff reasonably should have learned that the elements of an actionable injury exist. *Greene v. Legacy Emanuel Hospital*, 335 Or 115, 123, 60 P3d 535 (2002) (if a plaintiff acquires information that "only would cause a reasonable person to inquire whether legally cognizable harm has occurred, the period of limitations would commence at some later point when, after inquiry, the facts reasonably should disclose the existence of an actionable injury").

In this case, a reasonable jury could find that, when plaintiffs received the USCIS letter, they did not have a duty to retain an expert, such as a lawyer, to investigate whether they had a claim against DHS related to Blanca's legal permanent resident status and citizenship and instead acted reasonably by attempting to rectify the situation with immigration authorities. At the time, plaintiffs did not know that Blanca would be subject to years of exclusion from the United States after she turned 18 years old in order to obtain a legal immigrant status in the United States. Plaintiffs had no knowledge of facts indicating that what they thought was Blanca's relatively easy pathway to legal residency and citizenship was available to her only while she was a minor. The letter from USCIS did not indicate that Blanca would be subject to any immigration penalties; rather, the letter indicated that Lisa was able to act on behalf of Blanca until Blanca was 21 years old and suggested to Lisa that she would be able to correct Blanca's immigration status. Lisa believed she could correct Blanca's citizenship status by following USCIS's instructions without the aid of an attorney. We

cannot say, as a matter of law, that it was unreasonable for plaintiffs to make that assumption and that plaintiffs had an immediate duty to investigate a potential claim against DHS by hiring an immigration lawyer.

We also reject DHS's argument that, even if plaintiffs were not aware of each specification of negligence relevant to their two claims for relief, their obligation to provide a tort claims notice arose when they became aware of a substantial possibility that they had "suffered *some* harm as a result of" DHS's alleged negligence. *Cairns v. Dole*, 195 Or App 742, 751, 99 P3d 781 (2004) (emphasis in original). DHS notes that plaintiffs were at least aware of some harm—that Blanca was not an American citizen—contrary to what DHS had led plaintiffs to believe.

In making that argument, DHS overlooks the import of a second distinct type of harm: Blanca was subject to deportation proceedings, was required to travel to Mexico to apply for an immigrant visa, and was subject to exclusion from this country for a decade or more to obtain legal permanent resident status. *See Gaston*, 318 Or at 260, ("[W]hen two different legally protected interests are at stake, awareness of a violation of one interest does not put a plaintiff on notice as a matter of law of the possible violation of other distinct legally protected interests. Each claim must be analyzed separately to determine if a plaintiff knew or should have known facts that would make a reasonable person aware of a substantial possibility that the legally protected interest had been invaded."). As previously noted, the summary judgment record reflects evidence from which a jury may conclude that there was a second harm and that plaintiffs acted reasonably when they did not consult an immigration attorney upon receipt of the letter from USCIS in 2007. On this record, a jury must decide the question; we simply cannot say, as a matter of law, that plaintiffs' knowledge of Blanca's lack of permanent residency status and citizenship in 2007 triggered the time for providing a tort claims notice concerning the second harm to plaintiffs. Accordingly, the trial court erred in entering summary

judgment in favor of DHS for lack of a timely tort claims notice.[8]

B. *Timeliness of the Complaint Under the Statute of Limitations*

DHS argues that, even if plaintiffs' claims are not barred because their tort claims notice was untimely, their claims are nonetheless barred by the statute of limitations, ORS 30.275, because they discovered their claims in August 2007 but filed this action more than two years later, in October 2009. Like the notice period, the statute of limitations can also be tolled by the discovery rule. *Stephens v. Bolman*, 314 Or 344, 349-50, 838 P2d 600 (1992), *rev dismissed*, 324 Or 177 (1996).

DHS's statute of limitations arguments rely on the same case law and are essentially the same as their arguments that plaintiffs' tort claims notice was untimely served. As previously explained, we cannot conclude, as a matter of law, when plaintiffs should have discovered their actionable injury based on the harm to Blanca's right to remain in the United States. DHS is not entitled to summary judgment on that portion of plaintiffs' claims for failing to timely commence the action.

C. *Statute of Ultimate Repose*

Finally, plaintiffs also assign as error the trial court's alternative ruling that plaintiffs' preadoption claim is barred by the statute of ultimate repose. The statute of ultimate repose, ORS 12.115, provides, in part:

"(1) In no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of."

DHS asserted and prevailed on its contention that plaintiffs' preadoption claim is barred because DHS's alleged negligent acts occurred more than 10 years before plaintiffs filed their complaint.

---

[8] Plaintiffs do not seriously defend the timeliness of their notice of tort claims based on Blanca's lack of citizenship. Plaintiffs knew in 2007 that Lisa had asked DHS to finalize American citizenship for Blanca and yet Blanca lacked citizenship, contrary to DHS's representations. The trial court did not err in dismissing the portion of plaintiffs' claims based on that theory of harm.

Unlike the statue of limitations, the discovery rule does not toll the statute of ultimate repose, because it was intended "to provide an overall maximum upper limit on the time within which a tort action could be brought, regardless of the date of discovery or of any other circumstances." *Josephs v. Burns & Bear*, 260 Or 493, 498, 491 P2d 203 (1971), *overruled on other grounds by Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001). But when a plaintiff's claim is based on violations of a defendant's continuing, mandatory duty that occurred within the 10-year period, the claim is not barred by the statute of ultimate repose and, therefore, is timely. *Little v. Wimmer*, 303 Or 580, 585, 739 P2d 564 (1987).

Relying on *Little*, plaintiffs contended that DHS had such a continuing duty to them until Blanca turned 18 years old, and so the statute of ultimate repose was inapplicable. The trial court rejected that argument, concluding that, although

> "plaintiffs did establish certain duties that the state owed the plaintiffs, * * * [the court] do[es] not find that those duties are by their terms capable of absorbing the state's pre-adoption, [discrete] acts of the alleged negligence into a larger, overarching duty that expired only when Blanca reached majority."

Plaintiffs also argued that the statute of ultimate repose was tolled because they had a continuous relationship of trust with DHS. The statute of ultimate repose can be tolled by an "active, continuous relationship" between the defendant and the plaintiff during the period when an action is permitted such that, because of the "relationship of trust and confidence" between the parties, the plaintiff is not in a position to recognize the existence of a claim against the defendant. *Cavan v. General Motors*, 280 Or 455, 457-58, 571 P2d 1249 (1977). The trial court rejected that argument, too.

On appeal, plaintiffs reiterate their two arguments as to why their preadoption claim is not barred by the statute of ultimate repose. We first address the continuing-duty argument.

### 1. *Continuing Duty*

As noted above, evidence of a continuous, mandatory duty can be used to avoid the applicability of the statute of ultimate repose. *Little*, 303 Or at 585. In *Little*, the plaintiffs brought an action against the state for negligent design, construction, and maintenance of a state highway. 303 Or at 583. The Supreme Court held that the plaintiffs' claims for negligent design and construction were barred by the statute of ultimate repose because the conduct giving rise to those claims occurred 10 years before they filed their complaint. *Id.* However, the plaintiffs' claims for negligent maintenance of a highway, including negligent failure to remedy a dangerous condition and failure to warn, were not time-barred because the state had a statutorily mandated, continuing duty to supervise and control the maintenance of the highway after its construction and through the date of the accident. *Id.* at 585. Plaintiffs argue that *Little* is analogous to this case. Specifically, they contend that DHS owed mandatory duties to plaintiffs in the form of care, supervision, and services, because Blanca was placed in DHS's custody before she was adopted, and DHS's duties continued up until Blanca turned 18 years old, even after her adoption.

DHS counters that plaintiffs' reliance on *Little* is misplaced. We understand DHS's argument to be that plaintiffs' preadoption claim is not properly based on violations of a continuing duty on the part of DHS, but, rather, it is based on DHS's alleged negligent acts that occurred more than 10 years before the action was commenced and that DHS failed to correct before Blanca was adopted. According to DHS, in those circumstances, the statute of ultimate repose bars plaintiffs' preadoption claim unless plaintiffs can show a relationship of trust; and, because there is nothing in the record that would permit the conclusion that the parties were in a relationship of trust, plaintiffs' preadoption claim is barred. For the following reasons, we agree with DHS that *Little* does not apply and reject plaintiffs' continuing, mandatory duty argument.

Plaintiffs specifically rely on *former* OAR 413-130-0170(1) (9/17/96), an administrative rule regarding post-adoption services, which provided:

"Freeing a special needs child for adoption through [DHS] presupposes a commitment by the agency to the child until the child reaches the age of 18 years or emancipation, whichever comes first. [DHS] assumes an obligation to the child, the adoptive parent(s) and to the family as a whole to maintain the placement through the delivery of adoption preservation services."

The term "special needs" includes a member of an ethnic, racial, or cultural minority" that includes Hispanics. Because Blanca is Hispanic, her family was eligible for post-adoption services. *Former* OAR 413-130-0020(2)(c) (9/17/96). Families that were eligible for post-adoption services could access services provided by DHS, other agencies, or community services, "such as counseling, adoptive parent's support group, family resource or unity meeting, respite care, temporary out-of-home care or residential treatment[.]" *Former* OAR 413-130-0180(2) (9/17/96). Plaintiffs note that Blanca and her family received post-adoption services from DHS in the form of a subsidy and health insurance benefits for Blanca until she reached 18 years of age.

Plaintiffs also rely on other administrative rules that require DHS to verify a child's citizenship for certain services, such as foster care or adoption assistance, that, in turn, are reserved for children who are citizens or "qualified aliens."[9] Plaintiffs assert that, because Blanca was in foster care and received adoption assistance (in the form of pre-adoption and post-adoption subsidies), DHS was required to verify Blanca's citizenship status. Plaintiffs also cite OAR 413-215-0411(2)(b)(H) (10/17/08), an administrate rule that requires a private adoption agency, licensed by DHS, to itemize the "[l]ikely charges of the U.S. Citizenship and Immigration Services" to the adoptive family, arguing that DHS should be held to an analogous duty to disclose costs and consequences of any likely actions by the USCIS.

---

[9] *See* OAR 413-100-0120(3)(b) (verification of child's U.S. citizenship status for foster care eligibility); OAR 413-100-0210(1), (2) (an eligible child for foster care must be a "United States citizen" or a "qualified alien"); OAR 413-100-0460(1) (12/29/95) (the child must be a United States citizen to be eligible for medical assistance); OAR 413-130-0040(3)(c) (7/1/08) (the child must a United State citizen or a "qualified alien" to be eligible for adoption assistance); OAR 413-130-0045(1) (7/1/09) (adoption assistance is limited to United States citizens).

Based on those rules, plaintiffs conclude that DHS had a continuous duty to secure citizenship for her. According to plaintiffs, because DHS "knew that Blanca's citizenship status had not been finalized," it had a continuous duty, until Blanca turned 18, to provide services to ensure Blanca would become a citizen in order to "preserve" her adoption. Plaintiffs argue that the statute of ultimate repose was not triggered until plaintiffs stopped receiving post-adoption services when Blanca turned 18 years old, 11 months before they filed their complaint; therefore, their preadoption claim is timely.

*Little* is inapplicable. Unlike the defendant in *Little*, DHS was not required, under the statutes or administrative rules cited by plaintiffs, to establish Blanca's citizenship after she was adopted. Although plaintiffs received some financial subsidies from DHS after she was adopted because Blanca was a qualified "special needs child," none of the rules on which plaintiffs relies created a *mandatory* duty that DHS secure Blanca's citizenship to preserve her adoption. Specifically, with respect to OAR 413-130-0040(3)(c) (7/1/08), on its face, the rule concerns verification of either citizenship or "qualified alien" status for eligibility for certain benefits, not a duty to secure citizenship or legal permanent resident status. In addition, pursuant to OAR 413-100-0210(2)(h), a "qualified alien" includes a child such as Blanca who "has been battered or subjected to extreme cruelty in the United States" and who otherwise satisfies the requirements of the immigration statute relating to the treatment of certain battered aliens. Accordingly, even assuming that OAR 413-130-0040(3)(c) (7/1/08) applied to the subsidies provided to plaintiffs, the rule did not require DHS to verify that Blanca was in fact a citizen if she was a "qualified alien." Furthermore, although DHS was required to provide post-adoption services, DHS did not assume an obligation to provide all post-adoption services possible to help "preserve" an adoption, including establishing a child's citizenship. Rather, DHS had discretion as to which services were made available to adoptive families based on its resources. *See* OAR 413-130-0180 (9/17/96) ("Post legal adoptive services will be determined by the availability of [DHS] and community resources.").

Nor does plaintiffs' reliance on other administrative rules show that DHS assumed any *continuing*, mandatory duty owed to plaintiffs. As DHS highlights, OAR 413-130-0040(3)(c) (7/1/08), the administrative rule that obligates DHS to verify a child's status either as a citizen or a "qualified alien" for eligibility to receive certain services, was not in effect until 2008, well after Blanca's 1999 adoption. Similarly, we reject plaintiffs' contention that, under OAR 413-215-0411(2)(b)(H) (10/17/08), DHS, like private adoption agencies, had a continuous duty to plaintiffs to disclose the costs and consequences of any likely action by USCIS. Assuming DHS had an analogous requirement, any duty to provide Lisa and her then-husband, a prospective adoptive family, with information regarding the cost of Blanca's adoption was breached in the 1990s. The duty runs to *prospective* adoptive families; the text of the rule does not suggest that the agency has a continuous duty to provide that information *after* families adopted children. *See* OAR 413-215-0411(2)(b) (10/12/08) (*"Before providing an adoption service* to a prospective adoptive parent, the adoption agency must itemize and disclose in writing to the parents the estimated fees and expenses the parent will be changed[.]" (Emphasis added.)). Accordingly, none of the administrative rules that plaintiffs cite establishes that DHS had the continuing, mandatory duty to establish Blanca's citizenship or permanent residency, which, according to plaintiffs, avoids the application of the statute of ultimate repose.

### 2. *Relationship of Trust*

The resolution of the continuing duty issue leads to plaintiffs' second, tolling-based argument concerning the statute of ultimate repose. Absent an ongoing relationship of trust between the parties, "the legislature did not intend the statute [of ultimate repose] to be circumvented by allegations that subsequent to the fundamental wrong, a continuing duty existed to rectify the results of such wrong." *Josephs*, 260 Or at 501-02. In this case, plaintiffs contend that they had such a relationship of trust with DHS.

Plaintiffs argue that they were dependent on DHS for care and services even after Blanca's adoption,

because Blanca was an abused, special needs child. Plaintiffs analogize the parties' relationship to a doctor-patient relationship. *See Cavan*, 280 Or at 458 (in *dicta*, explaining that the doctor-patient relationship might create a relationship of trust). Plaintiffs argue that, just as a patient relies on a doctor's assurances, they relied on DHS's assurances that, after the adoption Blanca would become a citizen because of DHS's position of authority. Specifically, plaintiffs contend that they relied on DHS's representation to them in 2000 that, after the passage of the CCA, Blanca would become an American citizen because her adoptive parents were American citizens.

DHS contends that, after Blanca's adoption was complete, the parties were not in an ongoing relationship of any significance that would have prevented plaintiffs from recognizing their alleged injury, as described in *Cavan*, 280 Or at 457-58. Although plaintiffs received financial subsidies after Blanca was adopted, DHS contends that, as a matter of law, that did not create a relationship of trust that tolled the statute of ultimate repose.

We agree with DHS that the parties did not have an ongoing relationship of trust that extended years after the adoption. In 2000, DHS conferred with Lisa and explained that, after the passage of the CCA, Blanca would automatically become a citizen because her adoptive parents were United States citizens. There is no evidence of any other communications between the parties from 2000 to 2009. Plaintiffs point only to the payments they received from DHS and the existence of some administrative rules as their evidence that they had a relationship of trust with DHS after Blanca was adopted. That evidence, however, would not permit a reasonable factfinder to conclude that there was "an active, continuous relationship" of trust between the parties, at least between 2000 and 2009 after Lisa's communications with DHS ceased, such that plaintiffs were unable to recognize the existence of a cause of action. *See Rutter v. Neuman*, 188 Or App 128, 136-37, 71 P3d 76 (2003) (explaining that there was "no evidence of any conversations, correspondence, or other communications" for years and that nothing demonstrated the existence of the sort of

"relationship of trust and confidence with the defendant" that the *Cavan* court held was necessary to toll the statute of ultimate repose). At best, Lisa trusted DHS when it told her that Blanca was a citizen in 2000, but thereafter, Lisa, as Blanca's parent, acted without consultation with or guidance or interference from DHS on any matter, including matters related to Blanca's immigration status. The statute of ultimate repose was not tolled, and plaintiffs' preadoption claims, which were more than 10 years old when plaintiffs filed their complaint, are barred.[10]

In light of the foregoing, the trial court correctly dismissed plaintiffs' preadoption claim, which pertains to alleged negligent acts by DHS that occurred before Blanca's adoption, more than 10 years before plaintiffs filed their complaint. We also accept DHS's argument that some of plaintiffs' allegations concerning DHS's negligent acts are, in effect, alleged failures to remedy past and time-barred negligent conduct in applying for Blanca's legal permanent resident status and, therefore, are also barred by the statute of ultimate repose. To the extent that plaintiffs allege such time-barred negligent acts in their post-adoption claim, those specifications of negligence are no longer actionable. What remains at issue are other negligent acts specified in plaintiffs' post-adoption claim, such as negligent misrepresentations in 2000, that allegedly resulted in the penalties Blanca has experienced, namely, her need to depart the United States with an exclusion from the United States for 10 years before she can apply for a visa to reenter this country legally. Whether plaintiffs timely asserted such allegations of negligence through their tort claims notice to DHS and by filing this action is a question for the jury, because there is a factual question as to the date plaintiffs knew or should have known that they had suffered harm to Blanca's right to remain in the United States.

Affirmed in part, reversed in part, and remanded.

---

[10] Plaintiffs raised two additional arguments as to why the statute of ultimate repose should be tolled. Those arguments rely on case law that is not controlling in Oregon. Because the case law is unpersuasive in light of Oregon law, we reject plaintiffs' arguments without further discussion.