Argued and submitted November 8, 2013, decision of Court of Appeals affirmed, judgment of circuit court reversed, and case remanded to that court for further proceedings May 30, 2014

S. Fred HALL;
and Viewcrest Investments, LLC,
an Oregon limited liability company,
*Petitioners on Review,*

*v.*

STATE OF OREGON,
by and through the
Oregon Department of Transportation,
*Respondent on Review,*

*and*

WESTEK PROPERTIES, LLC,
*Intervenor.*

(CC 081164; CA A146386; SC S060879)

326 P3d 1165

W. Michael Gillette, Schwabe, Williamson & Wyatt, P.C., Portland, argued the cause for petitioners on review. With him on the briefs was David Anderson.

Stephanie L. Striffler, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Mary H. Williams, Deputy Attorney General, Anna M. Joyce, Solicitor General, and Patrick M. Ebbett, Assistant Attorney General.

Denis M. Vannier, Deputy City Attorney, Portland Office of City Attorney, Portland, filed a brief on behalf of *amicus curiae* League of Oregon Cities.

BREWER, J.

## BREWER, J.

Plaintiffs, the owners of real property in Linn County, brought an inverse condemnation action against the Oregon Department of Transportation (ODOT). Plaintiffs alleged in their complaint and undertook to prove at trial that ODOT, by repeatedly making representations to others about its intention to landlock their property and initiate a condemnation action, created a nuisance that "blighted" plaintiffs' property, resulting in a compensable taking of the property under Article I, section 18, of the Oregon Constitution. A jury agreed and awarded plaintiffs more than $3,000,000 in damages. ODOT appealed the ensuing judgment, and the Court of Appeals reversed, holding that no taking had occurred. *Hall v. ODOT*, 252 Or App 649, 288 P3d 574 (2012). We allowed plaintiffs' petition for review, and, for the reasons set out below, we affirm the decision of the Court of Appeals, reverse the judgment of the trial court, and remand the case to that court for further proceedings.

### FACTS AND PROCEDURAL BACKGROUND

Because plaintiffs prevailed before the jury in the trial court, we view the facts in the light most favorable to them. *See Stuart v. Pittman*, 350 Or 410, 414, 255 P3d 482 (2011) (stating principle). Plaintiffs own a 25-acre parcel of land adjacent to Interstate 5 in Linn County. Included within that parcel are three small areas where plaintiffs have sold "sign easements" that allow for placement of, and access to, billboards. In addition, plaintiffs have an easement for access to an overpass that crosses Interstate 5, known as the "Viewcrest interchange." The company that manages the billboards uses the easement for access to the billboards. Without that easement, plaintiffs' parcel would be landlocked.

In 2001, ODOT started a public planning process to address certain safety concerns pertaining to the Viewcrest interchange. Among other ways to deal with those concerns, ODOT explored the possibility of closing the interchange. For various reasons, ODOT determined that closing the interchange was the best option available, even though it would leave plaintiffs' property landlocked and would require the

state to acquire that property by eminent domain. ODOT discussed its plans with plaintiffs and it made public statements about removing the Viewcrest interchange and condemning plaintiffs' property in public meetings, by telephone to interested parties who contacted ODOT to determine the status of the access, in the newspapers, and on the Internet.

ODOT encountered opposition to the removal of the Viewcrest interchange. At public meetings that ODOT held, it became clear that members of the public opposed removing the Viewcrest interchange before a replacement interchange could be built. In May 2002, ODOT announced that the proposed plan would be revised to delay removal of the Viewcrest interchange for three years. Around that time, ODOT learned that plaintiffs were trying to develop their property. An ODOT official sent an internal email to another ODOT official stating that, because it would have a negative impact on freeway safety, ODOT had taken steps to stop any future development of plaintiffs' property.

Between 2005 and 2007, plaintiffs attempted to sell their property or reach agreements to develop it; those efforts were unsuccessful. A real estate broker working with plaintiffs on a possible land exchange transaction testified that he was unable to consummate an agreement because of the uncertainty surrounding the potential closure of the Viewcrest interchange. During that period, ODOT continued to publicly discuss removing the interchange as one option among others for addressing traffic safety concerns in the area.

In 2008, plaintiffs commenced this action for inverse condemnation against ODOT in Linn County Circuit Court.[1] As pertinent here, plaintiffs alleged in their complaint: (1) ODOT had disseminated information to the public that plaintiffs' access to the state highway system would be eliminated and that ODOT planned to acquire plaintiffs' property through eminent domain proceedings; (2) ODOT had

---

[1] As elaborated below, "inverse condemnation" describes a claim "against a governmental agency to recover the value of property taken by the agency although no formal exercise of the power of eminent domain has been completed by the taking agency." *West Linn Corporate Park v. City of West Linn*, 349 Or 58, 64, 240 P3d 29 (2010) (internal quotation marks and citation omitted).

conducted public hearings informing the public, orally and in writing, that the Viewcrest interchange would be eliminated and plaintiffs' property condemned, and that plaintiffs' access to the interchange was dangerous and should be eliminated for public safety reasons; (3) ODOT had publicly discussed a document prepared by its agent, CH2MHill, concluding that the Viewcrest interchange was unsafe and recommending its closure and the commencement of eminent domain proceeding to acquire plaintiffs' property; (4) ODOT had informed officials of the City of Millersburg and the public that it intended to remove plaintiffs' access and landlock, then condemn, their property; and (5) when prospective investors, lessees, purchasers, and developers called ODOT to inquire about access to the highway, ODOT had informed them that it intended to close the Viewcrest interchange and initiate condemnation proceedings. Plaintiffs alleged that those representations "have had the effect of blighting plaintiffs' land" and that ODOT's "repetitive, intrusive conduct constitutes a nuisance" that denied them the substantial use, benefit, and profits of their property, and as such, constituted a taking for public purposes without the payment of just compensation. Plaintiffs further alleged that they suffered economic damages as a result of ODOT's conduct in the form of a reduction in the value of their property.

At trial, plaintiffs adduced evidence in support of the allegations in their complaint, including evidence of ODOT's repeated representations, both to the public and in internal communications, about closing the Viewcrest interchange, and they asserted that that evidence showed that ODOT's conduct was motivated by ill will toward them on the part of ODOT officials that was aimed at preventing any development of the property.[2] Plaintiffs also presented evidence that, in fact, they had been unable to develop or sell the property because of the possibility of a future condemnation action. In addition, both sides presented evidence to establish the value of the property.

---

[2] That particular "malice" theory was not alleged in plaintiffs' complaint, nor was it mentioned in any jury instruction. On review, the parties contest whether it was properly before the jury and, if so, whether the evidence supported an inference that ODOT employees acted with such a motive. For reasons explained below, it is not necessary to resolve those questions here.

Throughout the litigation, ODOT took the position that planning for public use of a parcel of private property does not amount to a compensable taking under Article I, section 18, unless it deprives the owner of all economically viable use of the property. Plaintiffs responded that they had never argued that ODOT took the property merely by planning for its public use; rather, plaintiffs asserted that they had couched their takings claim on the premise that ODOT's conduct, motivated by a desire to stop development at the site, amounted to a nuisance that "blighted" their property. Furthermore, plaintiffs argued that the standard for which ODOT had advocated in this case—that a taking occurs only when government conduct deprives a property owner of all economically viable use—applies only in cases in which the owner has alleged a "regulatory" taking. Plaintiffs insisted that they had never asserted that ODOT had engaged in rulemaking or any other legislative or quasilegislative act that had reduced the property's value. Instead, plaintiffs maintained, they could establish a taking by showing that ODOT had substantially interfered with the use and enjoyment of their land in a way that reduced its value.

At the close of evidence at trial, ODOT moved for a directed verdict on the ground that there was no evidence that its conduct had amounted to a nuisance but, rather, the evidence showed that it had engaged in planning for a public use, and the proper standard of harm was whether ODOT's conduct had deprived plaintiffs of all economically viable use of their property. The trial court agreed with plaintiffs' legal arguments, denied ODOT's motion for a directed verdict, and rejected ODOT's proposed jury instructions and a related challenge to the jury verdict forms. Instead, consistently with plaintiffs' theory of the case, the trial court instructed the jury as follows:

"Plaintiffs allege that the Oregon Department of Transportation took their property in violation of the Oregon Constitution and in violation of the Constitution of the United States. In order to prevail on this claim, Plaintiffs must prove each of the following elements: Number one, that the property allegedly taken has a legal right to vehicle access to the west end of the Viewcrest interchange;

number two, that the Department of Transportation's actions have substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their land and that Defendant's activities were sufficiently direct, particular, and of a magnitude to support a conclusion that the interference has reduced the fair market value of Plaintiffs' [land]."

In response to questions posed in the verdict form, the jury found that ODOT's actions had substantially and unreasonably interfered with plaintiffs' use and enjoyment of their land, and that those actions were sufficiently direct, particular, and of a magnitude to support a conclusion that that interference had reduced the fair market value of the property. The jury also found that the value of the property without the interference was $4,000,000 and that ODOT's interference had reduced that value by $3,378,750. After receiving the jury's verdict, the trial court denied ODOT's motion for judgment notwithstanding the verdict and entered judgment for plaintiffs.

On appeal, ODOT raised numerous assignments of error, most of which centered on its contention that plaintiffs could not prevail on their inverse condemnation claim without proving that ODOT had deprived them of all economically viable use of their property. The Court of Appeals ultimately concluded that evidence that ODOT's actions lowered the value of plaintiffs' property was insufficient to establish a compensable taking. *Hall*, 252 Or App at 656. As a second ground for its decision, the Court of Appeals held that the trial court had erred if it denied ODOT's motion for a directed verdict because plaintiffs had proved that ODOT was not exercising its police power but instead was pursuing a vendetta against them. *Id.* at 655-56. The court concluded that plaintiffs' assertion that ODOT's malicious intention to prevent development of plaintiffs' property was self-defeating: "If *** the intent behind ODOT's actions was *not* to take plaintiffs' property for public use, then those actions could not amount to a taking." *Id.* at 655 (emphasis in original). The court reversed and remanded the case to the trial court.

On review, plaintiffs challenge both grounds underlying the Court of Appeals' decision. Because it resolves

the matter entirely, we confine our analysis to plaintiffs' assertion that the trial court properly based its dispositive ulings, jury instructions, and verdict form on its conclusion that the substantial-interference-with-use-and-enjoyment standard—not the more stringent deprivation-of-all-economically-viable-use standard—applied to plaintiffs' inverse condemnation claim. As we will explain, because the actions that plaintiffs challenge involved planning related to the designation of plaintiffs' property for eventual public use, and plaintiffs did not allege that those actions deprived them of all economically viable use of their property or prove that ODOT physically occupied their property or invaded their property rights in a way that substantially interfered with its necessary use and enjoyment, the trial court erred in denying ODOT's motion for a directed verdict.

## ANALYSIS

Article I, section 18, provides:

"Private property shall not be taken for public use * * * without just compensation[.]"

A "taking" of property is a shorthand description for an exercise of the government's power of eminent domain, which is the power of the sovereign to take property for "public use" without the property owner's consent. *Dunn v. City of Milwaukie*, 355 Or 339, 346, 328 P3d 1261 (2014); *see also Coast Range Conifers v. Board of Forestry*, 339 Or 136, 142-43, 117 P3d 990 (2005) (discussing the term "taking"). Typically, government exercises its eminent domain power by initiating condemnation proceedings and, through such proceedings, compensating a property owner before appropriating property for a public purpose. *Dunn*, 355 Or at 346.

"But the power of eminent domain can be exercised *de facto* as well as well as *de jure*, which occurs when the government takes property interests through its actions without first initiating condemnation proceedings. When that happens, the property owner can bring an inverse condemnation action to obtain the just compensation that Article I, section 18, guarantees."

*Id.* at 347.

This court has distinguished among *de facto* takings depending on the nature of the governmental action that gave rise to the claim, and it has applied different standards to different categories of governmental actions. *Coast Range Conifers*, 339 Or at 146. Thus, for example, a *de facto* taking results when a governmental actor physically occupies private property or invades a private property right in a way that substantially interferes with the owner's use and enjoyment of the property, thereby reducing its value. *Dunn*, 355 Or at 348; *Vokoun v. City of Lake Oswego*, 335 Or 19, 26, 56 P3d 396 (2002). Takings by physical occupation or invasion can arise from different forms of governmental intrusions. For example, a taking can occur when a governmental invasion causes a nuisance that substantially interferes with the owner's use and enjoyment of his or her property. *Thornburg v. Port of Portland*, 233 Or 178, 190, 376 P2d 100 (1963) (*Thornburg I*). In addition, a taking can arise when a physical occupation of private property by a governmental actor amounts to a trespass. *Morrison v. Clackamas County.*, 141 Or 564, 568, 18 P2d 814 (1933).[3]

Other types of government actions also can result in a *de facto* taking. When, for example, a government regulation—rather than a physical occupation or invasion—restricts a property owner's right of possession, enjoyment, and use, a taking can occur if, as a consequence, the property retains no economically viable or substantial beneficial use. *Dunn,* 355 Or at 348; *Coast Range Conifers*, 339 Or at 146-47; *Boise Cascade Corp. v. Board of Forestry*, 325 Or 185, 197-98, 935 P2d 411 (1997).

In addition, when government zoning or planning actions involving the designation of private property for eventual public use result in a reduction in the property's value, the owner is entitled to compensation if, and only if: "(1) he [or she] is precluded from all economically feasible private uses pending eventual taking for public use; or (2) the designation results in such governmental intrusion as to

---

[3] Other types of physical occupations that can amount to takings include, for example, encroachments on an owner's right to ingress and egress, *Kurtz v. Southern Pacific Co.*, 80 Or 213, 155 P 367 (1916), and encroachments on rights to lateral or subjacent support. *Mosier v. Oregon Navigation Co.*, 39 Or 256, 64 P 453 (1901).

inflict virtually irreversible damage." *Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 614, 581 P2d 50 (1978); *see also Suess Builders Co. v. City of Beaverton*, 294 Or 254, 261-63, 656 P2d 306 (1982) (applying that standard).

The primary issue on review in this case is which of those types of government actions is at issue here and, derivatively, which corresponding standard for determining whether a *de facto* taking has occurred applies. Plaintiffs point out that there was no evidence that ODOT's conduct was motivated by a regulatory purpose. Moreover, plaintiffs assert that ODOT's conduct went "far beyond planning." Accordingly, they urge that the requirements for takings involving those types of government actions do not apply in this case. Instead, as mentioned, plaintiffs theorize that ODOT's actions constituted a nuisance that "blighted" the value of their land. Plaintiffs assert that, in *Lincoln Loan Co. v. State Hwy. Comm.*, 274 Or 49, 545 P2d 105 (1976), this court recognized so-called "condemnation blight" as a separate category of nuisance-type takings—as distinct from regulatory or planning-type takings—that are subject to the substantial-interference-with-use-and-enjoyment standard and its associated reduction-in-value damage threshold. Because plaintiffs' theory depends heavily on that understanding of *Lincoln Loan*, we begin our analysis with that case.

*Lincoln Loan* arose out of a successful demurrer to a complaint; the sole issue before this court was whether the complaint stated a claim for inverse condemnation. 274 Or at 52. The plaintiff, the owner of a residence and rental property in Portland, alleged that, 10 years before the commencement of that action, the Oregon State Highway Commission (the highway commission) had adopted a resolution declaring that the plaintiff's property, and other neighboring real property, were necessary to the construction of a freeway, and it had filed condemnation proceedings against the plaintiff's property.[4] *Id.* at 51. The plaintiff further alleged that, in the intervening years, the highway commission had published notices about the impending condemnation; had

---

[4] The complaint did not allege when, during the course of that period, the highway commission's condemnation action was filed or whether it was pending when the plaintiff filed its own action for inverse condemnation.

informed property owners that it would not compensate them for improvements to their property; had dismantled neighboring dwellings and had brought in heavy equipment to demolish adjacent buildings, thereby creating noise, dust, and confusion, and encouraging decay and desertion of the area; and had informed the plaintiff's tenants that they would be required to vacate their buildings and that the highway commission would pay them compensation if they did so. *Id.* at 51-52. The plaintiff alleged that those actions made it impossible to keep rental schedules or to maintain the residence. *Id.* at 52. Finally, the plaintiff alleged that the resulting "condemnation blight" reduced the value of its property and thereby effected an unconstitutional taking of the property. *Id.* at 51.

This court held that those allegations were sufficient to state an inverse condemnation claim. In reaching that conclusion, the court considered the prior development of inverse condemnation law in Oregon. The court first discussed *Morrison,* a trespass case that involved governmental construction of a jetty in the Sandy River that diverted water over the plaintiff's land with such force that it washed away the plaintiff's personal possessions and improvements on the land, as well as the topsoil. Relying on *Morrison,* the court reiterated that a taking does not require evidence that the owner was completely dispossessed of the property or that the property was completely destroyed. *Lincoln Loan,* 274 Or at 53, (citing *Morrison,* 141 Or at 569). Similarly, the court observed that, in *Tomasek v. Oregon Highway Com'n,* 196 Or 120, 248 P2d 703 (1952), also a trespass case involving flooding, the court had held that even a partial destruction of property could constitute a taking for a public purpose under Article I, section 18. *Lincoln Loan,* 274 Or at 54 (citing *Tomasek,* 196 Or at 151).

In contrast, the court in *Lincoln Loan* noted that, in *Moeller v. Multnomah County,* 218 Or 413, 425-27, 345 P2d 813 (1959), it had held that a complaint alleging that the county had "taken" property by conducting nearby blasting operations that caused cracking in the plaintiff's house was sufficient to state a cause of action; however, the *Moeller* court had further held that, because mere damage

to property will not suffice to effect a taking, the evidence in that case did not show

> "either actual physical taking of the plaintiff's property by the defendant, or sufficient evidence of destruction, restriction or interruption of the necessary use and enjoyment of their property to warrant recovery under the theory of inverse condemnation."

*Lincoln Loan*, 274 Or at 54, (quoting *Moeller*, 218 Or at 430-31).

The court in *Lincoln Loan* observed that the doctrine of inverse condemnation was broadened in *Cereghino v. State Highway Com.*, 230 Or 439, 370 P2d 694 (1962)—another trespass case involving flooding—where the court held that the word "property" in Article I, section 18, referred not only to land, but to the "group of rights inhering in the citizen's relation to the physical thing, such as the right to possess, use and dispose of it." *Lincoln Loan*, 274 Or at 55 (quoting *Cereghino*, 230 Or at 445 (internal quotation marks and citation omitted)). Thus, the court in *Lincoln Loan* stated, "[i]t is therefore the landowner's rights which are 'taken' by the state in inverse condemnation, not part of the land itself." 274 Or at 55.

The court explained that the doctrine of inverse condemnation was expanded again in *Thornburg I. Lincoln Loan*, 274 Or at 55-56. In *Thornburg I*, the plaintiffs had alleged a taking based on jet planes flying near the plaintiffs' property, causing a noise nuisance. The court there held that the definition of a "taking" articulated in *Morrison*—"any destruction, restriction or interruption of the common and necessary use and enjoyment of the property of a person for a public purpose"—was broad enough to encompass a continuing nuisance. *Thornburg I*, 233 Or at 184-85. The court in *Lincoln Loan* stated that *Thornburg I* "was significant because it expanded the rule of inverse condemnation from purely trespassory actions to actions based on nuisance." *Lincoln Loan*, 274 Or at 56.

The court in *Thornburg I* remanded the case to the trial court, the case was retried, and ultimately, this court granted review again. *Thornburg v. Port of Portland*, 244 Or

69, 415 P2d 750 (1966) (*Thornburg II*). On review, this court concluded that jury instructions that the trial court gave on remand were erroneous. The court stated:

> "'The proper test to determine whether there has been a compensable invasion of the individual's property rights in a case of this kind is whether the interference with the use and enjoyment is sufficiently direct, sufficiently peculiar, and of sufficient magnitude to support a conclusion that the interference has reduced the fair market value of the plaintiff's land by a sum certain in money. If so, justice as between the state and the citizen requires the burden imposed to be borne by the public and not by the individual alone.'"

*Lincoln Loan*, 274 Or at 56 (quoting *Thornburg II*, 244 Or at 73). Based on those authorities, the court in *Lincoln Loan* concluded:

> "Viewed in the light of our precedents as set out above, we hold that plaintiff's complaint states facts sufficient to constitute a cause of action in inverse condemnation and that the trial court erred in sustaining the demurrer. Plaintiff has alleged adequate facts which indicate a substantial interference by the state with the use and enjoyment of its property. The combination of the acts alleged in plaintiff's complaint, the alleged pervasive extent of that combination of acts and the alleged duration of those acts over a ten year period unite to allege a substantial interference with the use and enjoyment of its property by plaintiff."

274 Or at 56-57.

Relying on the quoted holding in *Lincoln Loan*, plaintiffs contend that this court has recognized a category of takings described as "condemnation blight," which may be established by showing a substantial governmental interference with the use and enjoyment of property that results in a reduction in its value. As we will explain, plaintiffs read too much into *Lincoln Loan*, while failing to appreciate the significance of later decisions that are more pertinent here.

In evaluating whether the complaint in *Lincoln Loan* stated a claim for inverse condemnation, this court applied the test that it had announced in the *Thornburg* cases for determining whether "there has been a compensable invasion

of the individual's property rights *in a case of this kind."* *Thornburg II*, 244 Or at 73 (emphasis added). In *Thornburg I* and *Thornburg II*, "a case of this kind" was a case involving a nuisance. A nuisance claim requires a showing of "hurt, annoyance, or detriment of the [plaintiff's] lands or heredi- taments." *Amphitheaters, Inc. v. Portland Meadows*, 184 Or 336, 347, 198 P2d 847 (1948). The concept of nuisance refers to the property interest invaded and not to the type of con- duct that subjects the actor to liability. *Jacobson v. Crown Zellerbach*, 273 Or 15, 18, 539 P2d 641 (1975). The plaintiff in *Lincoln Loan* alleged that the defendant had interfered with its use and enjoyment of its property by, among other things, creating noise, dust, and confusion by the demolition of neighboring properties.

Viewed in its particular context, *Lincoln Loan* thus stands for the proposition that a precondemnation, govern- ment-created nuisance that substantially interferes with an owner's right to the use and enjoyment of property can give rise to an inverse condemnation claim based on a result- ing reduction in the property's value. However, nothing in *Lincoln Loan* suggests that, in the absence of a physical occupation or invasion of a property right, a government action that causes only a reduction in the value of prop- erty qualifies as a taking. To the contrary, all the Oregon cases on which the court relied in *Lincoln Loan* involved the invasion of a specific, identifiable private property right: *Morrison, Tomasek*, and *Cereghino* each involved an actual physical occupation, and in *Thornburg I*, the court referred to the noisy overflights there as having imposed a "servi- tude" or easement on the plaintiff's property. 233 Or at 186- 87. That commonality of harm suggests that the court in *Lincoln Loan* attempted to accommodate the allegations of the complaint in that case to the then-existing inverse con- demnation paradigm involving governmental occupations or invasions of an interest in private property. *See Thornburg I*, 233 Or at 192 ("[A] taking occurs whenever government acts in such a way as substantially to deprive an owner of the useful possession of that which he owns, either by repeated trespasses or by repeated nontrespassory invasions called 'nuisance.'").

This court's application of the substantial-interference-with-use-and-enjoyment standard in *Lincoln Loan* stands in contrast to its treatment of inverse condemnation claims that do not involve a governmental occupation or invasion of a private property right. In *Fifth Avenue*, for example, the complaint alleged a taking resulting from the designation of part of the plaintiff's property for eventual public use. When the plaintiff in that case bought its property—about 20 acres of undeveloped property in Washington County—the governing zoning ordinance permitted the construction of the type of shopping center that the plaintiff intended to build. Several years later, though, the Washington County Board of Commissioners (the board) enacted an ordinance that rezoned the plaintiff's property so that that type of shopping center no longer was permitted. Soon thereafter, the board adopted a comprehensive plan that designated part of the plaintiff's property for public use. The plaintiff brought an action for inverse condemnation alleging that, by enacting a zoning ordinance that prohibited construction of the planned shopping center, and by adopting a comprehensive plan that designated parts of the plaintiff's property for eventual public use, the board had rendered the property "substantially valueless" and totally deprived the plaintiff of its economic use and benefit. *Fifth Avenue*, 282 Or at 608.

On review, this court concluded that the plaintiff had failed to state a claim for inverse condemnation. With respect to the part of the complaint that alleged a "down-zoning"—that is, a change in the zoning ordinance to prohibit a use that formerly was permitted—the court reiterated that, "[w]here a zoning designation allows a landowner some substantial beneficial use of his property, the landowner is not deprived of his property, nor is his property 'taken.'" 282 Or at 609. The court concluded that the complaint showed on its face that the new zoning designations had permitted the plaintiff to retain some beneficial use of its property; therefore, the court held that the trial court did not err in sustaining the board's demurrer to that aspect of the complaint. *Id.*

With respect to the part of the complaint that alleged that the designation of some of the plaintiff's property for

public use amounted to a "taking," the court observed that the allegation that the plaintiff did not retain any substantial beneficial use of the property after the designation was not contradicted by the complaint itself. The court stated,

> "The question squarely presented, then, is whether the mere designation for eventual public use of portions of plaintiff's property by the [comprehensive plan] constitutes a 'taking' under Art I, § 18, of the Oregon Constitution, which states that 'private property shall not be taken for public use * * * without just compensation.'"

*Id.* at 610 (ellipsis by the court).

In answering that question, the court in *Fifth Avenue* first observed that the "generally accepted rule is that *mere* plotting or planning in anticipation of a public improvement does not constitute a taking or damaging of property affected." *Id.* (citation and internal quotation marks omitted; emphasis added by the court). The court explained that the reasons for that general rule are several. First, plotting and planning alone do not amount to an invasion of property or deprive the owner of the use and enjoyment of the property. Second, a projected improvement may be abandoned and the property never actually disturbed. Third, the possibility of condemnation is one of the conditions on which an owner holds property. And fourth, the general rule is helpful to the growth and expansion of municipalities. *Id.* The court acknowledged that it was not clear that the general rule was strictly applicable in that case because the board actually had adopted the comprehensive plan that contained the public use designation; therefore, the board's actions arguably went beyond "mere plotting or planning." *Id.* at 611. Nonetheless, the court concluded that,

> "even if planning or zoning designates land for a public use and thereby effects some diminution in value of his land, the owner is not entitled to compensation for inverse condemnation unless: (1) he is precluded from all economically feasible private uses pending eventual taking for public use; or (2) the designation results in such governmental intrusion as to inflict virtually irreversible damage."

*Id.* at 614 (footnote omitted).[5]

---

[5] Because the complaint in *Fifth Avenue* did not allege facts to support either of the two described exceptions, this court concluded that the trial court did not

It is apparent from the quoted passage that the court meant to announce a set of governing principles for inverse condemnation claims that involve governmental planning or zoning actions related to the designation of private property for eventual taking for public use. The court stated that, generally speaking, such actions do not result in a taking but, importantly, it set out two exceptions to that general rule.

The first exception, which applies when such actions preclude an owner from all economically feasible private uses pending an eventual taking by eminent domain, covers what this court has sometimes described as condemnation blight. *See Coast Range Conifers,* 339 Or at 147 n 12 (describing first exception set out in *Fifth Avenue,* as discussed in *Dodd v. Hood River County,* 317 Or 172, 181-82, 855 P2d 608 (1993), as encompassing "condemnation blight" takings that arise from planning for eventual taking for public use). That understanding is reinforced by this court's decision in *Suess Builders.*

In that case, the owners of property in the City of Beaverton brought an inverse condemnation action against the city; the complaint alleged that, by designating the plaintiffs' property as a future park site in its comprehensive plan, the city temporarily had deprived them of the rental value of the property and caused a permanent reduction in its market value. The trial court granted the defendants' motion to dismiss the complaint for failure to allege sufficient facts to state a claim for relief.

On review, this court reiterated that governmental planning and zoning actions related to the designation of property for eventual public use that reduce the value of the property do not result in a compensable taking unless the owner is deprived of all economically viable private uses of the land pending the eventual taking. 294 Or at 257-58. In determining whether the complaint was sufficient to withstand a motion to dismiss, the court noted that the plaintiff had not asserted a "regulatory takings" claim like the

err in sustaining the board's demurrer to the part of the plaintiff's complaint alleging a *de facto* taking based on the comprehensive plan designation of parts of its property for public use. 282 Or at 614.

down-zoning claim in *Fifth Avenue. Id.* at 258. Rather, the court stated, "[r]egulation enters this case only because [the] plaintiffs claim that the plan designation in legal and practical effect made the property unusable for anything other than the indicated public taking until the defendants changed their mind and rescinded their decision to acquire it." 294 Or at 260. In particular, the complaint in *Suess Builders* alleged that "the governmental bodies in effect told [the] plaintiffs to hold parts of their land for the park district, subject to taxes and without an opportunity to make economic use of it or to place it on the market, until the district was politically and financially ready to buy it for the planned park." *Id.*

The court stated that the city's designation of the plaintiffs' property for public use under the comprehensive plan was not necessarily the equivalent of a taking when the plan was adopted, because the city was not obligated to buy the property at that point and could change its mind; in the latter circumstance, the plaintiffs would retain the property (as in fact happened in *Suess Builders*). *Id.* And, because governments, like other prospective buyers, do change their minds (and would have to pay just compensation if they did not), it was not a foregone conclusion that the plaintiff would be unable to sell the property. Nonetheless, the court stated,

> "adoption of a plan could be the equivalent of taking the use of the property until the government decided to buy it or to release it, *if the legal effect of defendant's actions is to 'freeze' the status of the land for that purpose without any possibility of an economic use.* If that is the effect, it might be described as analogous to seizing from the landowner an option to buy the land during an indefinite term."

*Id.* (emphasis added).[6] The emphasized portion of the quoted passage captures the essence of what courts sometimes have termed condemnation "blight." *See, e.g., J.K.S. Realty, LLC v. City of Nashua,* 164 NH 228, 55 A3d 941, 947-49 (2012)

---

[6] For purposes of determining whether the plaintiffs in *Suess Builders* had pleaded sufficient facts to establish a *de facto* taking, the court reiterated that the critical question was "whether the landowner faced with a plan designation of his land for a public use can show that he is precluded from all feasible private use of the property pending its eventual acquisition." 294 Or at 261. The court concluded that the plaintiffs' complaint contained allegations that, if proved, would amount to such a showing. *Id.* at 263.

(describing as precondemnation "blight" government actions that "freeze" the status of property so as to deprive the owner of all economically viable use pending its taking by eminent domain); *Peacock v. County of Sacramento*, 271 Cal App 2d 845, 77 Cal Rptr 391, 403-05 (1969) (finding taking where effect of government actions was to freeze development of any meaningful kind and thereby to deny plaintiffs any practical or beneficial use of their property).[7]

The second exception that the court described in *Fifth Avenue* arises where, as in *Lincoln Loan,* precondemnation government action results in a physical occupation of private property or invasion of private property rights that substantially interferes with an owner's rights of exclusive possession and use. In describing that exception, the court in *Fifth Avenue* quoted with approval a passage from a law review article suggesting that a taking arises when a regulation or planning activity "has already caused government to encroach on land with trespassory consequences that are largely irreversible." *Fifth Avenue*, 282 Or at 613-14, quoting John J. Costonis, *"Fair" Compensation and the Accomodation Power: Antidotes for the Taking Impasse in Land Use Controversies*, 75 Col L Rev 1021, 1035 (1975). The court further stated that "[w]e do not wish to limit the second exception to trespassory encroachments only, since we have already extended it to *repeated nontrespassory invasions called nuisance.*" *Fifth Avenue*, 282 Or at 613 n 17 (internal quotation marks omitted; emphasis added). Significantly, the court cited *Lincoln Loan* as the source of that "extension," *id.*, which is consistent with this court's application of the substantial-interference-with-use-and-enjoyment standard for takings (and its associated reduction-in-value threshold damage requirement) to the physical invasions that occurred in *Lincoln Loan.*

---

[7] Condemnation "blight" is a term

"applied somewhat imprecisely to the detrimental conditions that befall land slated for public acquisition. Either the project is undesirable and depresses values for some distance around its proposed boundaries, or, whatever the nature of the project, the affected land will surely be taken (or so the market believes) and hence, becomes virtually useless to the private sector of the market."

Gideon Kanner, *Developments in Eminent Domain: A Candle in the Dark Corner of the Law*, 52 J Urban L 862, 891-92 (1975).

## SUMMARY AND APPLICATION

The foregoing principles provide the necessary foundation for our decision in this case. To summarize: A *de facto* taking of private property can arise from various types of government actions, including physical occupations or invasions of property rights, regulation of the use of property, and planning for the eventual taking of property by eminent domain. When a governmental actor physically occupies private property or invades a private property right in a way that substantially interferes with the owner's use and enjoyment of the property, a *de facto* taking results. *Dunn*, 355 Or at 348; *Thornburg I*, 233 Or at 190.

By contrast, government regulation of the use of property or planning for the eventual taking of property for public use that reduces the property's value generally does not result in a *de facto* taking. *Fifth Avenue,* 282 Or at 614. There are two recognized exceptions to that general rule: The first arises when a regulation or planning action deprives the owner of all economically viable use of the property. Contrary to plaintiffs' assertion, that proof requirement—not the reduction-in-value damage requirement associated with the substantial-interference-with-use-and-enjoyment standard—applies to *de facto* takings claims based on effects that can be characterized as condemnation blight. *Coast Range Conifers*, 339 Or at 147 n 12; *Suess Builders*, 294 Or at 260. The second—although denominated in *Fifth Avenue* as an exception where planning for public use is involved—is merely a restatement of the separate (and freestanding) principle that a taking results if a physical governmental occupation or invasion of property rights substantially has interfered with the owner's use and enjoyment of the property. *Fifth Avenue*, 282 Or at 614 n 17.

Although plaintiffs assign certain descriptive labels to the posited effects of ODOT's actions in this case—"nuisance" and "condemnation blight"—each of the challenged actions themselves were, according to plaintiffs own pleadings and evidence, related to ODOT's precondemnation designation of plaintiffs' property for eventual public use. Accordingly, we apply the principles set out in *Fifth Avenue* to resolve plaintiffs' claim. Under those principles, ODOT's

actions did not give rise to a *de facto* taking unless plaintiffs proved that those actions deprived them of all economically viable use of their property or that ODOT physically occupied their property or invaded their property rights so as to substantially interfere with its use and enjoyment.

Here, plaintiffs understandably did not allege that ODOT's actions deprived them of all economically viable use of their property. The evidence at trial showed that plaintiffs had been able to sell billboard easements on the property and that those billboards generated income. Because plaintiffs' property retained some economically viable use, plaintiffs could not establish a cognizable *de facto* taking by condemnation blight. *Coast Range Conifers*, 339 Or at 147 n 12; *Suess Builders*, 294 Or at 260.

Instead, as discussed, plaintiffs' primary theory—in their pleadings, at trial, and on appeal—was that ODOT's actions resulted in a nuisance that substantially interfered with the use and enjoyment of their property and thereby reduced its value. However, there was no evidence that ODOT's actions had any effect on plaintiff's property other than to reduce its value. Plaintiffs did not allege or prove any physical occupation of their property or invasion of their property rights such as the invasions that were alleged in *Thornburg* and *Lincoln Loan*. Thus, whether ODOT's actions constituted planning or, as plaintiffs assert, went "far beyond planning," the conclusion is the same: Plaintiffs' evidence was insufficient to satisfy the standard that they undertook to meet.

Although plaintiffs argue that evidence that ODOT employees had a malicious purpose to deter development of their property is relevant to the analysis, they are mistaken. As discussed, it is the effect of ODOT's actions on plaintiffs' property, not the posited reasons for those actions, that determines whether a nuisance existed and whether ODOT substantially interfered with plaintiffs' use and enjoyment of their property so as to result in a taking. *See Jacobson*, 273 Or at 18 ("nuisance" refers to interest invaded, not to type of conduct that subjects the actor to liability). In short, evidence concerning the motives of ODOT's employees does not alter our conclusion that plaintiffs failed to prove that

ODOT's actions resulted in a *de facto* taking of their property rights.[8] Accordingly, the trial court erred in denying ODOT's motion for a directed verdict.[9]

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to that court for further proceedings.

---

[8] We do not mean to suggest that government conduct that impairs the value of property and is motivated by malice must go remediless. Governmental entities can be liable for intentional torts that do not amount to a taking of property. *See Gearin v. Marion County*, 110 Or 390, 402, 223 P 929 (1924) (distinguishing eminent domain from tort, in part, by whether governmental acts are done with intent to take private property for public use).

[9] Plaintiffs' complaint also alleged a taking under the Fifth Amendment to the United States Constitution, but, as the Court of Appeals noted, to the extent that the verdict and judgment reflected a ruling under the federal constitution, plaintiffs did not separately defend that ruling on appeal. *Hall*, 252 Or App at 653 n 2. Nor do plaintiffs raise a federal constitutional argument in this court; accordingly, we do not address that issue.