Argued and submitted January 4, 2001, decision of Court of Appeals and judgment of circuit court affirmed December 27, 2002

Bobbie J. GREENE,
*Petitioner on Review,*

*v.*

LEGACY EMANUEL HOSPITAL
AND HEALTH CARE CENTER,
an Oregon corporation,
*Defendant,*

*and*

Cheryl L. NESLER, M.D.,
*Respondent on Review.*

(CC 9707-05788; CA A102423; SC S47406)

60 P3d 535

J. Michael Alexander, Swanson, Lathen, Alexander & McCann, PC, Salem, argued the cause and filed the briefs for petitioner on review.

Nancy S. Tauman, Hibbard Caldwell Schultz Ramis & Crew, Oregon City, argued the cause and filed the brief for respondent on review. With her on the brief was Nelson L. Walker.

Thomas M. Christ, Mitchell, Lang & Smith, Portland, argued the cause and filed a brief on behalf of *amicus curiae* Oregon Association of Defense Counsel.

Helen T. Dziuba, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, Riggs, and De Muniz, Justices.**

DURHAM, J.

---

** Balmer, J., did not participate in the consideration or decision of this case.

## DURHAM, J.

This is an action to recover damages for injuries that plaintiff received during a surgical operation. The issue is whether plaintiff commenced the action after expiration of the two-year period of limitations set out in ORS 12.110(4), quoted below. The trial court concluded that plaintiff's action was time-barred and granted summary judgment, ORCP 47, in favor of defendant Nesler.[1] The Court of Appeals affirmed. *Greene v. Legacy Emanuel Hospital*, 165 Or App 543, 997 P2d 265 (2000). For the following reasons, we also affirm.

We review the record on summary judgment in the light most favorable to the nonmoving party below—here, plaintiff—and draw all reasonable inferences from the facts in her favor. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997).

On July 26, 1995, plaintiff entered Legacy Emanuel Hospital so that her physician, Nesler, could perform out-patient surgery to abort a fetus with severe abnormalities. During the procedure, Nesler perforated plaintiff's uterine wall and colon with forceps. Nesler completed the abortion and other doctors repaired the perforations. The surgery lasted six hours and led to an 11-day recuperation in the hospital. Plaintiff has suffered permanent injuries from the surgical complication.

Plaintiff retained a lawyer, Zeitz, to represent her in connection with the surgery. On August 22, 1995, Zeitz sent the hospital a request for a copy of plaintiff's medical records. On November 10, 1995, the hospital provided the pertinent records to Zeitz. On May 14, 1996, Zeitz sent a letter to the hospital and Nesler offering to settle plaintiff's claims. The letter described in detail the injuries that plaintiff suffered during the surgery.[2]

---

[1] The record on review presents no issue regarding the liability of the other defendant, Legacy Emanuel Hospital and Health Care Center.

[2] In that letter, the lawyer stated:

"Due to the negligence of Dr. Nesler and Emanuel Hospital, Ms. Greene's posterial [*sic*] uterine wall was torn open. The tear was deep enough and severe enough to also tear into my client's bowels."

The letter also described the pain and permanent consequences that plaintiff suffered from the alleged negligent surgery. The record contains no evidence that the

In March 1997, plaintiff retained another lawyer, Miller, to represent her. Miller obtained plaintiff's medical records from Zeitz and sought an evaluation of plaintiff's case from other physicians. In June 1997, one of the physicians that Miller had contacted opined that Nesler's surgical treatment of plaintiff was negligent.

In an affidavit, plaintiff said the following regarding her awareness of the pertinent facts:

"* * * I did not discover that treatment I received from Dr. Nesler, on or about July 26, 1995, was somehow negligent until several months after the initial procedure. I was aware that a complication had occurred which required me to remain in the hospital for eleven (11) days after the initial procedure. Thus, I was aware of an injury and that the injury was the result of Dr. Nesler's conduct. But, I was not made aware that Dr. Nesler was somehow negligent until my attorney Sanford W. Zeitz had an opportunity to review all requested medical information.

"Attorney Zeitz requested all medical information * * * on August 22nd, 1995. The requested medical information was not provided until on or about November 10th, 1995. Thus, my attorney at that time had an opportunity to have this medical information evaluated by a medical doctor.

"In March 1997, I retained Robert J. Miller, Sr. to take over representation of my case. Mr. Miller obtained all medical information from attorney Zeitz and had it evaluated by two medical doctors. One of the physicians agreed and informed me that Dr. Nesler's conduct was outside the standards of care for this community. This was the first time that I had actual confirmation of negligent conduct by Dr. Nesler. It was approximately during the month of June 1997 when I received confirmation of the negligent treatment.

"Thus, my first opportunity for discovering the negligent conduct of Dr. Nesler was on or about November 10th, 1995 when medical information was provided to attorney

---

lawyer relied on an expert witness's evaluation of plaintiff's medical records in stating that description of plaintiff's injuries. From all that appears in the record, plaintiff's description of her injuries to the lawyer and plaintiff's medical records, which the lawyer received on November 10, 1995, enabled the lawyer to describe plaintiff's injuries in detail in the May 14, 1996, letter.

Zeitz. But still, it wasn't until approximately June of 1997 that I had actual confirmation of the negligent treatment."

Plaintiff filed a complaint against defendants on July 24, 1997, and served Nesler with the complaint on November 14, 1997. Because plaintiff served Nesler more than 60 days after she filed the complaint, ORS 12.020(1) requires that we deem the action commenced on the date on which she served the complaint: November 14, 1997.[3]

■    ORS 12.110(4) sets out the period of limitations that governs plaintiff's action:

"An action to recover damages for injuries to the person arising from any medical, surgical or dental treatment, omission or operation shall be commenced within two years from the date when the injury is first discovered or in the exercise of reasonable care should have been discovered. * * *"

We must determine whether the record demonstrates that a factual dispute exists about whether plaintiff "discovered or in the exercise of reasonable care should have * * * discovered" her injury more than two years before the date on which she commenced her action, November 14, 1997.

The two-year period of limitations in ORS 12.110(4) begins on the date when a plaintiff discovers or, in the exercise of reasonable care, should have discovered his or her "injury." In *Gaston v. Parsons*, 318 Or 247, 864 P2d 1319 (1994), this court determined that the term "injury" has a well-accepted legal meaning, that is, a "legally cognizable harm." *Id.* at 253. *Gaston* also held that the term "injury"

---

[3] ORS 12.020 provides:

"(1) Except as provided in subsection (2) of this section, for the purpose of determining whether an action has been commenced within the time limited, an action shall be deemed commenced as to each defendant, when the complaint is filed, and the summons served on the defendant, or on a codefendant who is a joint contractor, or otherwise united in interest with the defendant.

"(2) If the first publication of summons or other service of summons in an action occurs before the expiration of 60 days after the date on which the complaint in the action was filed, the action against each person of whom the court by such service has acquired jurisdiction shall be deemed to have been commenced upon the date on which the complaint in the action was filed."

The facts of this case render the 60-day provision described in ORS 12.020(2) inapplicable.

embraces three elements: (1) harm; (2) causation; and (3) tortious conduct. *Id.* at 255.

Plaintiff's affidavit, quoted above, makes clear that she was aware, immediately after the surgical procedure, that she had suffered an injury during the surgery and that Nesler's conduct had caused the injury. Nevertheless, she denies that she learned that Nesler's conduct "was somehow negligent until my attorney Sanford W. Zeitz had an opportunity to review all requested medical information." She also argues, however, that she did not discover the "tortious conduct" element of her "injury" until a doctor confirmed, many months after plaintiff left the hospital, that Nesler's conduct constituted professional negligence.

Plaintiff contends, in particular, that the Court of Appeals misapplied the concept of "inquiry notice" that this court discussed in *Doe v. American Red Cross*, 322 Or 502, 513-14, 910 P2d 364 (1996), by holding that the period of limitations commences when the plaintiff *begins to inquire* about whether the defendant's harmful conduct was tortious.[4] According to plaintiff, the statutory period commences when the plaintiff discovers, as a result of any inquiry, that the defendant's conduct was tortious. In this instance, plaintiff asserts, she discovered that information less than two years before she commenced her action against Nesler.

The conflicting arguments of the parties and *amici curiae* demonstrate that legal shorthand is a poor substitute for careful construction of statutory text. We note, for example, that the parties' use of an inartful catchphrase, "inquiry

---

[4] Plaintiff relies for her argument on the following passage from the opinion of the Court of Appeals:

"Here, plaintiff was aware that her colon had been perforated during an outpatient procedure that resulted in an 11-day stay in the hospital. Although not all surgical complications in every circumstance will put a patient on inquiry notice as to medical malpractice, our review of the summary judgment record in this case persuades us that a reasonable person in plaintiff's position would have known of a substantial possibility of malpractice when informed of the nature of the complication. The trial court did not err in ruling that the two-year statute of limitations ran before plaintiff commenced her action."

*Greene*, 165 Or App at 549-50.

notice," about the proper application of ORS 12.110(4), as discussed below, has expanded rather than narrowed their disagreement. Particularly because this court's discussions in case law may have contributed to the resulting confusion, we take this opportunity to bring some clarity to our analysis of ORS 12.110(4).

In *Doe*, this court borrowed the phrase "inquiry notice" from one of the parties and used it to explain the application of the period of limitations in ORS 12.110(4) to the particular facts of that case. This court stated:

"[W]e conclude that plaintiff's knowledge in October 1987 of the harm caused to John Doe by HIV contaminated blood supplied by the Red Cross would have put plaintiff on *inquiry notice* of the existence of tortious conduct by defendants, as a matter of law."

*Doe*, 322 Or at 515 (emphasis added).

The phrase "inquiry notice" does not appear in ORS 12.110(4). Before *Doe*, this court had used that phrase to determine whether a person with some awareness of an unrecorded interest in real property could claim the status of a *bona fide* purchaser. *See High v. Davis*, 283 Or 315, 333, 584 P2d 725 (1978) (describing "inquiry notice" as specie of constructive notice regarding outstanding interests in land). *High* cited *Belt et ux. v. Matson et al.*, 120 Or 313, 252 P 80 (1927), which did not use the phrase "inquiry notice" but illustrated the pertinent legal concept as follows:

"The law has been well settled from early times in this state that a subsequent purchaser with notice of an outstanding unrecorded title, encumbrance or interest in real property takes title subject to the outstanding unrecorded title. If the subsequent purchaser has information sufficient to put him upon inquiry as to such outstanding unrecorded title and reasonable inquiry would lead to full information regarding such unrecorded interest and he neglects to make such inquiry, he takes title to the land charged with such outstanding title or interest.

"* * * * *

"*Carter v. Portland*, 4 Or. 339, 350 [(1873)]:

" 'The general doctrine is, that whatever is sufficient to direct the attention of a purchaser to the prior rights and equities of third persons, and to enable him to ascertain their nature by inquiry, will operate as notice.' *Musgrove v. Bonser*, 5 Or. 313, 317 [(1874)] (20 Am. Rep. 737)."

*Belt*, 120 Or at 320-21.

Those passages demonstrate that the constructive notice rule in the law of real property functions to determine *whether* a purchaser of real property had imputed notice of unrecorded interests in the property at the time of purchase. By contrast, the imputed discovery standard in ORS 12.110(4) functions to determine *when* a reasonably careful plaintiff should have discovered an injury, including the element of tortious conduct.

■■ In view of that important distinction, we perceive a risk of analytical error in the use of the phrase "inquiry notice" in connection with ORS 12.110(4). The period of limitations in that statute commences from the earlier of two possible events: (1) the date of the plaintiff's *actual discovery* of injury; or (2) the date when a person exercising reasonable care *should have discovered* the injury, including learning facts that an inquiry would have disclosed. In neither of those circumstances does the period of limitations begin to run from the plaintiff's discovery of facts that serve only to trigger a duty to inquire about whether an injury has occurred. Even if a plaintiff acquires information about a surgical complication that only would cause a reasonable person to inquire whether legally cognizable harm has occurred, the period of limitations would commence at some later point when, after inquiry, the facts reasonably should disclose the existence of an actionable injury. To avoid that risk of confusion, we discourage the use of the phrase "inquiry notice" in connection with the application of ORS 12.110(4).

*Gaston* held that, under ORS 12.110(4), the commencement of the period of limitations is not postponed until the plaintiff acquires "[a]ctual knowledge that each element [of an injury] is present." 318 Or at 256. Indeed, as the discussion above confirms, if the facts satisfy the "should have been discovered" standard under that statute, then the

period of limitations commences notwithstanding the plaintiff's complete failure to acquire actual knowledge of the injury.

Gaston also discussed the proof necessary to establish the element of "tortious conduct" for purposes of ORS 12.110(4):

> "Although 'tortious conduct' is an element of injury under the discovery rule, a plaintiff does not need to identify a particular theory of recovery before the statute of limitations begins to run. All that is required is that the plaintiff discover that some invasion of the legally protected interest at stake has occurred. For example, when a plaintiff discovers that he or she has wrongfully been harmed by the conduct of another, he or she need not further discover whether the defendant's act was intentional or negligent for the statute of limitations to begin to run. Discovery that the plaintiff's legally protected interest to be free from physical harm at the hands of another had been infringed is sufficient to satisfy the tortious conduct element of the discovery rule."

Id. at 255 n 8. Gaston cautions that the plaintiff's "mere suspicion" about the occurrence of tortious conduct is insufficient to commence the period of limitations. Id. at 256. However, Gaston confirms that the "tortious conduct" element of the requirement of "injury" under ORS 12.110(4) is satisfied, and the period of limitations commences, if the record on summary judgment demonstrates that the plaintiff either actually discovered or, in the exercise of reasonable care, should have discovered that the defendant violated the plaintiff's legally protected interest to be free from physical harm at the hands of another.

According to Gaston, the statutory requirement of discovery, either actual or imputed, of tortious conduct is a factual question that depends on the nature of the harm suffered, the nature of the medical procedure, and all other relevant circumstances. Id. at 256. Examining the significance of the nature of the harm suffered, Gaston stated:

> "Although, in many instances, suffering an untoward result after surgery may put a reasonable person on notice of tortious conduct, certain untoward effects can 'mask' tortious conduct. A reasonable person that experiences symptoms

that are incidental to a particular medical procedure may not be aware that he or she has been a victim of tortious conduct:

> " 'Normally, knowledge of injury as a result of defendants' actions would put the injured party on sufficient notice of defendants' tortious conduct to commence the running of the statute. However, immediate, adverse side effects commonly result from medical treatment given to gain long-range and more important benefits. Knowledge of momentary, adverse effects which are immediately controlled would not put plaintiff on notice as a matter of law of tortious conduct by defendants.' *Frohs v. Greene*, [253 Or 1, 7, 452 P2d 564 (1969)]."

*Id.* at 256-57.

*Gaston* illustrates how the factors mentioned in that passage might lead to the conclusion that a plaintiff's knowledge of undesired effects from surgery does not necessarily establish discovery, actual or imputed, of an injury for purposes of ORS 12.110(4). In *Gaston*, the plaintiff was a partial quadriplegic whose only functioning limb was his left arm. To treat muscle spasms in the plaintiff's lower body, the defendant physician, Parsons, suggested a spinal injection of chemicals. The physician did not warn the plaintiff of a risk of loss of function in his arm. After the injection, the plaintiff's arm was numb and did not function. The physician assured the plaintiff that the loss of function was temporary, but the plaintiff never regained the use of his arm. The plaintiff filed an action against the physician more than two years after he lost the use of his arm. *Id.* at 251.

Addressing the physician's statute of limitations defense, the court held that

> "Plaintiff's symptoms were not so clearly unrelated to the procedure performed that as a matter of law a reasonable person would believe that the cause was tortious conduct. In addition, Parsons assured plaintiff that the numbness and loss of use that plaintiff experienced in his left arm was temporary. The assurance raises a genuine issue of fact as to its effect upon a reasonable person."

*Id.* at 258.

The *Gaston* court cited the following passage from *Berry v. Branner*, 245 Or 307, 312-13, 421 P2d 996 (1966), in support of its analysis of ORS 12.110(4):

"The objective of a statutory limitation on the time within which an action may be brought is, in malpractice cases, the protection of medical practitioners from the assertion of stale claims. We do not believe the legislature intended to limit patients asserting malpractice claims, who by the very nature of the treatment had no way of immediately ascertaining their injury, to the same overall period of time that is allowed for bringing other tort actions that are normally immediately ascertainable upon commission of the wrong. The protection of the medical profession from stale claims does not require such a harsh rule. The mischief the statute was intended to remedy was delay in the assertion of a legal right by one who had slumbered for the statutory period during which process was within his reach."

In *Berry*, a surgeon had left a needle in a patient's body during surgery. This court held that the period of limitations on the patient's claim commenced when the patient discovered that the cause of her post-surgical pain was the surgeon's error in leaving a needle in her body, stating:

"To say that a cause of action accrues to a person when she may maintain an action thereon and, at the same time, that it accrues before she has or can reasonably be expected to have knowledge of any wrong inflicted upon her is patently inconsistent and unrealistic. She cannot maintain an action before she knows she has one."

*Id.* at 312.

Also pertinent to this discussion is *Doe v. American Red Cross*. In *Doe*, a doctor transfused the plaintiff's decedent during surgery in 1985 with blood supplied by the American Red Cross. Over two years later, the doctor informed the decedent that the blood might have been contaminated with Human Immunodeficiency Virus (HIV). The decedent knew that that virus could cause Acquired Immunodeficiency Syndrome (AIDS) and was potentially life-threatening. In 1990, the decedent sued. In 1991, the decedent died from the effects of the contaminated blood and AIDS. Discussing the requirement in ORS 12.110(4) of discovery, actual or

imputed, of injury, including "tortious conduct," this court stated:

> "In the ordinary case, that last element [*i.e.*, tortious conduct] will appear as a matter of course. This, however, is not an ordinary case, because of the nascent state of the law and science with respect to HIV and AIDS at the pertinent time.
>
> "* * * [Although plaintiff had a duty to inquire regarding the existence of tortious conduct by the defendants,] the existence of a duty to inquire does not foreclose the possibility of a factual dispute concerning the question of what the Does would have learned. Application of the discovery rule's 'knew or should have known' standard makes the issue of what the Does 'should have known' about the possibility of defendants' 'tortious conduct' an issue of material fact."

322 Or at 515. *Doe* thus recognizes that the circumstances surrounding an adverse medical outcome might permit a reasonably careful person to discover only the *possibility* of the defendant's tortious conduct, rather than its existence, and give rise to a duty to inquire. In that circumstance, according to *Doe*, factual questions about what the plaintiff should have discovered likely will persist until the facts learned as the result of an inquiry would cause a reasonable person to discover that tortious conduct occurred.

We turn next to the application of the law discussed above to the facts of this case. *Frohs*, *Gaston*, and *Doe* confirm that, in the ordinary medical malpractice case, a plaintiff's awareness that a medical procedure has resulted in a distinct injury, and that the defendant doctor's actions caused that injury, will establish the plaintiff's discovery, either actual or imputed, of the defendant's tortious conduct for purposes of ORS 12.110(4). As the discussion below demonstrates, this case appears to be such an ordinary case. When plaintiff left the hospital in August 1995, and clearly from the time that plaintiff's lawyer received a copy of her medical records on November 10, 1995, plaintiff had discovered or reasonably should have discovered that, during the abortion procedure on July 26, 1995, Nesler had perforated her uterine wall and colon with forceps.

The cases also indicate that certain special circumstances surrounding a medical procedure can create a factual question about whether the plaintiff discovered or should have discovered the presence of tortious conduct from the fact of injury at a physician's hands. However, the record in this case fails to establish the presence of any of those special circumstances. The perforations to plaintiff's uterine wall and colon were not momentary adverse side effects that commonly result from the abortion procedure to which plaintiff had consented. The perforations were a distinct injury. Nothing about the abortion procedure or its adverse effects masked the injury that plaintiff suffered. In contrast to *Gaston*, the record does not suggest that Nesler downplayed either the fact or likely consequences of the perforations or made any false or misleading statement about the injury to plaintiff. In contrast to *Doe*, this case involves no novel principle or procedure of medical science and no uncertainty regarding the state of the law. The record contains no other factual assertion that would support a conclusion that a reasonably careful plaintiff might not have discovered Nesler's tortious conduct from the injury that occurred during surgery. To paraphrase *Berry*, plaintiff is not a patient who had no way of immediately ascertaining her injury.

Plaintiff emphasizes that, according to her affidavit, she did not receive "actual confirmation of negligent conduct by Dr. Nesler" until March 1997, when another doctor examined her medical records. We acknowledge, as this court stated in *Gaston*, 318 Or at 256, that the nature of the harm suffered, the nature of the medical treatment received or other relevant circumstances may delay or prevent the discovery of tortious conduct until a separate medical evaluation or diagnosis occurs and, thus, create a factual question about discovery that precludes summary judgment. But, on the present record, the medical opinion that plaintiff received in March 1997 served only to confirm the discovery of tortious conduct that plaintiff reasonably should have made when she learned, soon after surgery, that the perforations had occurred. In other words, the facts that plaintiff knew regarding her injury did not induce mere suspicions that might have given rise to a duty to make an inquiry to confirm

whether tortious conduct had occurred. The facts that plaintiff knew regarding her injury satisfied the standard in ORS 12.110(4) for discovery, actual or imputed, of tortious conduct. The following statement by this court in *Schiele v. Hobart Corporation*, 284 Or 483, 490, 587 P2d 1010 (1978), is pertinent here:

> "[W]e reject plaintiff's contention that nothing short of a positive diagnosis by a physician will [commence the period of limitations]. A plaintiff whose condition has not yet been diagnosed by a physician can have or, in the exercise of reasonable care, could have access to information which requires or would require a reasonable person to conclude she is being seriously or permanently injured."

From the foregoing, we conclude that, on the present record, plaintiff discovered or reasonably should have discovered that she had suffered an "injury," that is, legally cognizable harm resulting from Nesler's actions, when she learned of the injury in the hospital and certainly no later than her lawyer's receipt of her medical records on November 10, 1995. Plaintiff did not file her action until more than two years had elapsed from that date. Because no genuine issue of material fact exists regarding those events, the trial court did not err in granting summary judgment for Nesler.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.