Argued and submitted September 6, 2013, plaintiff's 42 USC section 1983 claims and inverse condemnation claim reversed and remanded; otherwise affirmed July 30, 2014

THE FOSTER GROUP, INC.,
an Oregon corporation,
*Plaintiff-Appellant,*

*v.*

CITY OF ELGIN, OREGON,
an Oregon municipality,
*Defendant-Respondent,*

*and*

BAGETT, GRIFFITH & BLACKMAN,
an assumed business name of
Rimrock Land Surveying, LLC,
*Defendant.*

Union County Circuit Court
090945953; A150344

332 P3d 354

Todd Foster argued the cause and filed the briefs for appellant.

Matthew J. Kalmanson argued the cause for respondent. On the brief were Marjorie A. Speirs, Janet M. Schroer, and Hart Wagner LLP.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

This appeal concerns the timeliness of several claims brought by plaintiff, the owner of a mobile home park, against the City of Elgin. Those claims stem from two alleged wrongful acts by the city. First, in support of claims for trespass, negligent interference with real property, ejectment, civil conspiracy to commit fraud, and inverse condemnation, plaintiff alleged that the city, in 2004, constructed a road that encroached on plaintiff's property and conspired with a surveyor to fraudulently report that the city, not plaintiff, owned the property underlying the road. Second, in support of federal due process and equal protection claims under 42 USC section 1983, plaintiff alleged that the city, without giving notice, decided to block access from plaintiff's private drives onto that road in 2008. The city successfully moved for summary judgment, arguing that all of plaintiff's claims were untimely under the applicable statutes of limitations. Plaintiff appeals, arguing that all of the claims in its September 2009 complaint were timely.

We conclude that the trial court erred in ruling that plaintiff's section 1983 claims, based on conduct that occurred in 2008, were outside the applicable two-year statute of limitations, and its inverse condemnation claim, based on the city's physical occupation of plaintiff's property in 2004, was outside the six-year statute of limitations that governs that claim. The trial court did not err, however, in concluding, as a matter of law, that plaintiff's claims for trespass, negligence, and civil conspiracy accrued more than two years before plaintiff filed its complaint and were therefore outside the applicable two-year statute of limitations. Further, we do not consider plaintiff's claim that the trial court erred in applying a two-year statute of limitations, rather than a 10-year statute of limitations, to the ejectment claim because plaintiff invited any error in applying that limitation period. Accordingly, we reverse with respect to the section 1983 claims and inverse condemnation claim and otherwise affirm.

Because this case comes to us on summary judgment, we state the facts and all reasonable inferences that can be drawn from them in the light most favorable to

plaintiff, the nonmoving party, to determine whether the city is entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997).

The Elgin Mobile Home Park was built in two phases between 1968 and 1977. Plaintiff's president, Eldon Foster, who was trained as an engineer, drew up the plans for the park and developed it with the city's approval. Although Foster never had the park property surveyed, he understood that an existing cattle fence marked the property's southern border. He also was aware of an exception to plaintiff's title that gave the city a right to construct a road, Beverly Terrace, along the property's southern border. Foster understood that that cattle fence marked what would become the center line of Beverly Terrace and the road would extend 25 feet onto park property. The park was designed and built based on that understanding.

By the time the park was completed in 1977, it complied with all surveys on record, including two surveys commissioned by the city in 1972 and 1974. Although those surveys generally were consistent with the southern boundary line marked by the cattle fence, Foster was not aware of those surveys at the time.

In 1978, surveyor Bagett, Griffith & Blackman (Bagett) conducted and recorded an additional survey for a nearby landowner. The 1978 survey was different than those completed earlier in the decade. Along with other changes, the survey shifted the southern boundary of the park, neighboring properties, and the boundary of Beverly Terrace approximately 25 feet north. As with the earlier 1970s surveys, Foster was not aware of the 1978 survey at the time.

In August 2000, Foster sought to acquire property adjacent to the park from neighboring landowners. Though Foster was unsuccessful, he learned that those landowners planned to ask the city to construct Beverly Terrace. Foster contacted the city recorder, Joe Garlitz, to discuss the possibility that the city would allow a neighboring landowner to develop property that would require the construction

of Beverly Terrace. Garlitz stated that the existing fence marked the southern boundary of the park property, within three or four feet. Soon after, however, Garlitz told Foster that the park encroached on the proposed location of Beverly Terrace.

Foster decided that he would commission a boundary survey. At Garlitz's suggestion, Foster commissioned Bagett to survey the park in May 2001. Foster received the survey, read it, and discovered that it showed the park encroaching onto Beverly Terrace by approximately 25 feet. That is, it now appeared that the center line of Beverly Terrace was not marked by the cattle fence; nearly all of Beverly Terrace was located north of the fence, on what plaintiff had believed was its property. The survey showed that one mobile home and three storage buildings would encroach onto Beverly Terrace.

Sometime after, Foster called Garlitz to discuss the survey. Garlitz stated that the city would not construct Beverly Terrace until the neighboring landowners paid for the development. He also told Foster that, if the city built the road, it would only build the middle 22 feet, not the full 50 feet as originally planned. Further, according to plaintiff's complaint, Garlitz "acknowledged that the surveys of the City were fraught with errors and for that reason he believed the City Council would grant the Park a five-foot setback under the terms of a conditional use permit."[1] The upshot for Foster was that none of the park's structures would have to be moved.

Two years later, in September 2003, Foster learned that the city had voted to construct the entire 50-foot right-of-way of Beverly Terrace. At a September 9, 2003, city council meeting, a public works supervisor said that he would like to have plaintiff clear the right-of-way within 30 days.

---

[1] When the city moved for summary judgment, it relied on certain allegations in plaintiff's complaint as admissions for purposes of summary judgment. *See Kerry v. Quicehuatl*, 213 Or App 589, 595-96, 162 P3d 1033, *rev den*, 343 Or 690 (2007) (treating factual allegations in the plaintiff's complaint as judicial admissions that supported grant of summary judgment in favor of the defendant). The city notes that its citation to those allegations or any other evidence submitted by plaintiff "indicates acceptance for purposes of the motion for summary judgment only." For its part, plaintiff does not dispute the facts as described in its complaint.

Construction was delayed, however, and in February and March 2004, the city sent two follow-up letters to plaintiff again requesting to clear the right-of-way. Sometime after the March letter, plaintiff relocated a mobile home, three storage buildings, and underground utilities.

In September 2004, the city constructed Beverly Terrace. To do so, the city removed park sidewalks and top-soil in a swath of land approximately 25 feet wide and 250 feet long. Beverly Terrace was then connected with two private driveways in the park.

On January 15, 2008, Garlitz wrote to plaintiff complaining that the park's current configuration was not suitable for the residential zoning in the area or the conditional use permit under which the park was originally approved. Garlitz identified two problems: Plaintiff violated city code requirements for setbacks because two mobile homes were within less than 10 feet of Beverly Terrace, and the connection of two interior park roads to Beverly Terrace was contrary to the "original design" for the park. Before the construction of Beverly Terrace, all traffic entered the park through another street, and, in the city's view, connection of the park streets to Beverly Terrace "dramatically changed the traffic flow" and "basically eliminated any security control the park may have had over vehicles entering or leaving the park." Garlitz proposed that plaintiff either move mobile homes to conform to city setback and other zoning requirements or construct a "boundary fence that isolates the park from Beverly Terrace" in a manner compatible with the residential zoning. The letter set September 30, 2008, as a deadline to fix the alleged problems.

In a May 2008 meeting, however, the city council voted to block the park's access to Beverly Terrace. Because Foster did not have notice that the city was going to discuss the issue, he did not attend the meeting. Later that same month, the public works department erected two rock berms that blocked park access to Beverly Terrace.

The city's action to block access to Beverly Terrace prompted Foster, for the first time, to question the legality of the city's actions and the accuracy of the 2001 survey. As part of an investigation that lasted from May to June 2008,

Foster discovered that the 1972 and 1974 surveys confirmed his original understanding that the cattle fence marked the park's southern boundary. By visual inspection, Foster could discern that those surveys, which were referenced in the 2001 survey, conflicted with the surveys conducted in 1978 and 2001. That discovery caused Foster to suspect, for the first time, that the 2001 survey was erroneous. Foster then sought advice from local surveyors. He learned that border disputes were common in Elgin, that the city had knowledge of the contradictory surveys from the 1970s, and that the city freely granted variances to zoning and setback ordinances in light of issues with survey accuracy.

Plaintiff subsequently delivered tort claim notice on August 16, 2008, and filed its complaint on September 28, 2009. After the parties engaged in discovery, the city moved for summary judgment, asserting that all plaintiff's claims were untimely under various statutes of limitations. The trial court agreed with the city and granted summary judgment in its favor. On appeal, plaintiff challenges the trial court's ruling on all of its claims in four separate assignments of error. We address each in turn.

We begin with plaintiff's argument that the trial court erred in ruling that its tort claims for trespass, negligent interference with real property, and civil conspiracy to commit fraud were untimely. All of those claims were based on the city's construction of Beverly Terrace in September 2004, which resulted in the removal of topsoil, park sidewalks, a mobile home, utilities, and storage sheds. As set forth in plaintiff's complaint, the trespass and negligence claims were based on the city's invasion and occupation of plaintiff's property, and the civil conspiracy claim was based on the city's "act of aiding and abetting Bagett * * * to commit fraud by presenting [plaintiff] with the factually and legally inaccurate 2001 survey."

It is undisputed that those claims, brought pursuant to the Oregon Tort Claims Act (OTCA), are subject to a two-year statute of limitations, ORS 30.275(9),[2] and that

---

[2] ORS 30.275(9) provides:

"Except as provided in ORS 12.120, 12.135 and 659A.875, but notwithstanding any other provision of ORS chapter 12 or other statute providing a

the OTCA's limitations period may be tolled under the discovery rule. *See Doe v. Lake Oswego School District*, 353 Or 321, 327, 297 P3d 1287 (2013) (citing *Adams v. Oregon State Police*, 289 Or 233, 239, 611 P2d 1153 (1980)) (so stating). In the context of an OTCA claim, that rule provides that the statute of limitations does not begin to run until "a plaintiff has a reasonable opportunity to *discover his injury* and the identity of the party responsible for that injury." *Id.* (internal quotation marks omitted; emphasis in original). As the court has further explained, an "'injury' is discovered when a plaintiff knows or should have known of the existence of three elements: (1) harm; (2) causation; and (3) tortious conduct." *Id.* at 328. Put another way, the limitations period does not commence until a plaintiff knows or, in the exercise of reasonable care should know, that he or she has been harmed and that there is a substantial possibility that the harm was caused by an identified person's tortious conduct. *Johnson v. Mult. Co. Dept. of Community Justice*, 344 Or 111, 118, 178 P3d 210 (2008). "Application of the discovery accrual rule is a factual question for the jury unless the only conclusion a reasonable jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter." *T. R. v. Boy Scouts of America*, 344 Or 282, 296, 181 P3d 758 (2008).

Although plaintiff acknowledges that, by 2004, it was aware that the city had caused it harm (because the city's construction of Beverly Terrace required the removal of topsoil, sidewalks, and buildings), plaintiff contends that there is at least a factual question as to whether it should have known that there was a substantial possibility that the city's conduct was wrongful (because the city constructed Beverly Terrace on plaintiff's property, not the city's). Plaintiff argues that a jury could find that it was reasonable to rely on the 2001 survey as establishing the correct property lines. In plaintiff's view, there was no reason to question the accuracy of the 2001 survey when the

---

limitation on the commencement of an action, an action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of [the OTCA] shall be commenced within two years after the alleged loss or injury."

city constructed Beverly Terrace in 2004. The city responds that plaintiff should have known, by 2004, that there was a substantial possibility that the city had built on its property.[3] The city contends that, "[a]t the very least, plaintiff had sufficient information to begin an inquiry" because the 2001 survey "did not match the survey boundaries it had previously relied upon" and because plaintiff "knew that the City had problems with inaccurate surveys."

As the parties' arguments suggest, in determining what a person in the exercise of reasonable care should have known, we must consider whether a reasonable person in plaintiff's circumstances would have made further inquiry. *Gaston v. Parsons*, 318 Or 247, 256, 864 P2d 1319 (1994). Where the circumstances trigger a duty to inquire, we must also consider what facts would have been uncovered had such an inquiry been made. *T. R.*, 344 Or at 294. The point in time when an investigation would have disclosed facts that made a reasonable person aware of a substantial possibility of injury marks the beginning of the limitations period. *Id.* (clarifying that limitations period does not accrue at the point when the plaintiff had duty to investigate); *Greene v. Legacy Emanuel Hospital*, 335 Or 115, 123, 60 P3d 535 (2002) (the limitations period commences "when, after inquiry, the facts reasonably should disclose the existence of an actionable injury").

In this case, there is no question that, once plaintiff became aware that the city claimed that plaintiff did not own land that it thought it did, that triggered a duty to conduct some level of inquiry. *See Doughton v. Morrow*, 255 Or App 422, 430, 298 P3d 578, *rev den*, 353 Or 787 (2013) (concluding, in action for negligent construction, that when a neighboring landowner told the plaintiffs that they had mistakenly built a well on the neighbor's property, the discovery rule imposed upon plaintiffs "a duty to make follow-up inquiries" into who owned the land). And plaintiff did conduct an inquiry when the city claimed ownership of plaintiff's land: Foster commissioned a survey in 2001, and

---

[3] For purposes of summary judgment, the city accepted as true plaintiff's allegation that the cattle fence and the surveys of the early 1970s—as opposed to the 1978 and 2001 surveys—accurately marked the boundary lines of plaintiff's property.

he reviewed that survey in enough detail to discern that the property line had shifted to the detriment of plaintiff and the benefit of the city.

The question that remains is whether plaintiff—by relying on the 2001 survey without further inquiry—failed to conduct an investigation that a reasonable person in similar circumstances would conduct. *T. R.*, 344 Or at 293. After receiving the survey, Foster did not go to the surveyor's office to discuss the survey, he could not recall having a conversation with the surveyor, he did not examine any of the surveys referenced in the 2001 survey, and he did not consult with other surveyors or professionals. Plaintiff claims that a jury could find that it was reasonable, under the circumstances, to rely on that survey without any further inquiry; the city claims that the only rational conclusion the record supports is that a reasonable person would have conducted a further inquiry. Given the particular circumstances of this case, which we review below, we agree with the city that plaintiff's no-questions-asked approach to the 2001 survey was unreasonable as a matter of law.

First, the 2001 survey results conflicted with plaintiff's understanding of its property line for the previous 20 years. Plaintiff asserts that it was nonetheless reasonable to credit the 2001 survey without question, because plaintiff never had its property surveyed and instead relied on informal markers like the cattle fence when it purchased the property in the late 1960s. But even if the markers on which plaintiff relied were "informal," Foster was nevertheless "aware of an exception to [plaintiff's] title giving the City a right to construct * * * Beverly Terrace along our southern boundary line" and specifically understood that the road "was originally designed to be 50' wide" and "was to be constructed overtop the southern-most 25' of [plaintiff's] property." Whatever the source of that information, plaintiff deemed it reliable enough to rely upon when designing and building the park. Yet when confronted with survey results that were incompatible with that understanding—and that required the destruction or removal of several structures on its property—plaintiff accepted those results without question.

Second, although plaintiff had not previously commissioned a survey of its property, plaintiff—a trained engineer who could read plans and surveys—understood that the 2001 survey referenced several other previous surveys spanning several decades. Although the 2001 survey did not specify whether the boundary lines it reported were in conflict with any of those previous surveys, plaintiff knew that its property had been surveyed several times before, during, and after the time plaintiff developed its property. Yet plaintiff did not inquire whether any of those surveys confirmed what plaintiff had believed to be its property line for the previous 20 years.

Third, the inconsistency in information plaintiff received about its property line was exacerbated by the city's changing position. In August 2000, when Garlitz and Foster discussed the city's possible development of Beverly Terrace, Garlitz confirmed Foster's original understanding that the cattle fence marked its property line. Soon after, however, Garlitz changed his position and told Foster that the park encroached on the proposed location of Beverly Terrace.

Fourth, plaintiff had general information that there were problems with the accuracy of surveys in the area. Foster testified that he "had heard over the years of recurring survey problems in Elgin," though he had not heard of survey problems specific to the area in dispute. Further, according to plaintiff's complaint, Garlitz admitted to Foster in a 2003 conversation "that the surveys of the City were fraught with errors." That information, even if it was not specific to plaintiff's property, would reasonably trigger questions about the conflicting information plaintiff had received about its property line.

In sum, plaintiff designed and built its property based on an understanding of its property line and the placement of Beverly Terrace, and that understanding went unquestioned for decades. The city, as late as 2000, confirmed that understanding. Then, the city took the view that plaintiff did not own the property it thought it did, and a 2001 survey confirmed the city's position. Along with the conflicting information plaintiff received about its own borders, plaintiff knew there were general problems with

survey accuracy in Elgin. Under those particular circumstances, we conclude, as a matter of law, that a reasonable person of ordinary prudence would have made at least some minimal inquiry into the survey's results.

Finally, as plaintiff's later investigation demonstrates, that inquiry in 2004 would have uncovered facts that made plaintiff aware of a substantial possibility that the city had built Beverly Terrace on plaintiff's property. *See T. R.*, 344 Or at 294 (limitations period begins when inquiry would have disclosed facts of substantial possibility of injury). Plaintiff explained that its 2008 investigation into the 2001 survey revealed earlier conflicting surveys from 1972 and 1974, which spurred further investigation that quickly led plaintiff to believe that the city's conduct was tortious. Foster acknowledged that both those surveys were listed in the 2001 survey and were a matter of public record in 2004, and he further admitted that he could discern that they were in conflict with the 2001 survey by visual inspection. If plaintiff had inquired into the 2001 survey in 2004, it would have learned facts that would reasonably have made it aware of a substantial possibility of wrongful conduct, and the statute of limitations would have begun at that point. Accordingly, the discovery rule does not save plaintiff's claims for trespass,[4] negligence, and civil conspiracy to commit fraud from the two-year statute of limitations. Summary judgment on those claims was proper.[5]

Plaintiff next argues that the trial court erred in applying the OTCA's two-year statute of limitations to the ejectment claim. Plaintiff asserts that its "attempt to

---

[4] Plaintiff does not argue that the alleged trespass in this case could be deemed a continuing trespass, so that, even though an action for the city's original wrongful entry onto the property is barred by the statute of limitations, plaintiff could bring an action for damages resulting from the city's continuation of the trespass beyond the limitations period. *Restatement (Second) of Torts* § 160 comment h, § 161 comment b (1965) (describing continuing trespass claims). Accordingly, we express no opinion on that theory of recovery.

[5] Because we conclude that plaintiff's tort claims were untimely under the OTCA's statute of limitations, we need not address the city's related argument that, because plaintiff should have known that the city's conduct was wrongful in 2004, plaintiff failed to timely give tort claim notice "within 180 days after the alleged loss or injury," as required by the OTCA. *See* ORS 30.275(1), (2)(b) (describing notice requirements); *Adams*, 289 Or at 239 (discovery rule applies to OTCA notice requirements).

recover real property is not a tort covered by the [OTCA]." *See* ORS 30.260(8) (defining "[t]ort" for purposes of OTCA). In plaintiff's view, that claim is subject to a 10-year statute of limitations for an action to recover real property and was therefore timely brought. *See* ORS 12.050 ("An action for the recovery of real property, or for the recovery of the possession thereof, shall be commenced within 10 years.").

Plaintiff acknowledges that, in the trial court, it did not dispute that its action in ejectment was a tort claim subject to the OTCA's limitations period. But plaintiff now argues that we should review its unpreserved claim of error as plain error, *i.e.*, "an error apparent on the record, about which there is no reasonable dispute." *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008); ORAP 5.45(1) (providing that, for unpreserved claims of error, "the appellate court may consider an error of law apparent on the record"). In response, the city contends that plain-error review is not appropriate because plaintiff, by explicitly agreeing that the OTCA's limitations period covered the ejectment claim, invited any error by the trial court. *See State v. Ferguson*, 201 Or App 261, 269, 119 P3d 794 (2005), *rev den*, 340 Or 34 (2006) ("[I]f an appellant 'was actively instrumental in bringing about' the error, then the appellant 'cannot be heard to complain, and the case ought not to be reversed because of it.'" (Quoting *Anderson v. Oregon Railroad Co.*, 45 Or 211, 217, 77 P 119 (1904))).[6]

We agree with the city that plaintiff invited any error in applying a two-year limitations period to the ejectment claim. When the city moved for summary judgment, it grouped the ejectment claim with plaintiff's other tort claims, arguing that those claims were untimely under the OTCA's two-year statute of limitations. In its response brief, plaintiff agreed that its ejectment claim, along with its other

---

[6] The city further argues that plain-error review is not appropriate because the error is subject to "reasonable dispute." *Peeples*, 345 Or at 219. Indeed, the city contends there was no error at all. In the city's view, plaintiff's action meets the definition of "tort" under the OTCA and, therefore, is subject to its two-year limitations period, notwithstanding the 10-year limitations period that ordinarily governs ejectment actions. Because we conclude that plaintiff invited any error in applying the OTCA's statute of limitations to the ejectment claim, we do not address those arguments.

tort claims, was "governed by the OTCA, including its 180-day rule and its two-year statute of limitations," but argued that the OTCA's statute of limitations was tolled by the discovery rule. Because plaintiff explicitly represented to the trial court that the OTCA's two-year statute of limitations applied to its ejectment claim, plaintiff cannot now argue that the trial court erred by failing to apply a different statute of limitations. *See State v. Hardesty*, 238 Or App 146, 151, 241 P3d 741 (2010), *rev den*, 349 Or 654 (2011) (concluding that, where "[b]oth parties proceeded under a common understanding of the statutory requirements" in the trial court, the defendant could not complain on appeal "that the trial court erred because it failed to view the statute differently than presented by the parties"); *State v. Reeves*, 250 Or App 294, 302, 280 P3d 994, *rev den*, 352 Or 565 (2012) (invoking the "invited error" principle where the defendant, in seeking a motion for judgment of acquittal before the trial court, "explicitly embraced the understanding of the statute" that he sought to challenge on appeal). Accordingly, we will not further consider plaintiff's sole claim of error with respect to the ejectment claim.

Plaintiff next contends that the trial court erred in concluding that its section 1983 claims, which alleged violations of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution,[7] were untimely. Plaintiff alleged that its procedural due process rights were violated when the city council, without notice to plaintiff, voted to terminate its access to Beverly Terrace in a May 2008 meeting. Plaintiff alleged that it had "been damaged in the temporary loss of use of Beverly Terrace * * * in May 2008 when dirt and rock berms were placed as blockades to Beverly Terrace access." Plaintiff's equal protection claim was based, in part, on that same conduct; plaintiff alleged that it was "the only landowner in the City who has had its access to public streets terminated," and that conduct constituted "unequal treatment." Plaintiff further alleged that it had "been singled out for disparate and unequal protection of the law" when "the

---

[7] The Fourteenth Amendment provides, in part, that no state "shall * * * deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

City Council declined to respond to [plaintiff's] request for a variance" from certain city ordinances, even though the city "granted nearly all other applications for similar variance requests."

The parties agree that plaintiff's section 1983 claims are subject to a two-year statute of limitations. *See Gambaro v. Dept. of Justice*, 247 Or App 609, 617, 270 P3d 377 (2012) (explaining that section 1983 adopts statute of limitations for personal injury torts under state law); ORS 12.110(1) (providing two-year limitations period for personal injury torts). And the parties likewise agree that the limitations period is subject to the discovery rule. *See T. R.*, 344 Or at 291 ("As we have noted, the accrual rule that applies to determine when plaintiff's section 1983 claim accrued is a 'discovery' accrual rule.").

Plaintiff argues that, regardless of the operation of the discovery rule, its section 1983 claims were timely because they arose from the city's actions in 2008 and plaintiff filed its lawsuit less than two years later, in 2009. The city responds, without further elaboration, that "[p]laintiff was aware that *a* claim existed by 2003. Thus, its [section] 1983 claims, which are also subject to a two-year statute of limitations[,] were not timely filed." (Emphasis in original.) The city therefore appears to repeat the claim it made to the trial court—that plaintiff's section 1983 claims were time-barred because they "were brought well over two years after [p]laintiff learned of the boundary dispute, and altered its property for the street vacation."

We agree with plaintiff. The alleged actions by the city supporting plaintiff's due process and equal protection claims—the city's decision to block plaintiff's access to Beverly Terrace and the blocking of that access—occurred in 2008.[8] Because plaintiff could not have brought those

---

[8] As noted, plaintiff also alleged that it was denied equal protection of the law when the city failed to act on its request for a variance from city ordinances while granting those of other applicants. Although the city does not address that allegation, the record shows the city's conduct giving rise to that violation occurred in 2008: The city complained about plaintiff's alleged ordinance violations in January 2008, and plaintiff would have requested variances from those ordinances sometime after.

claims until that date, the statute of limitations did not begin to run at some earlier time. *See Duyck v. Tualatin Valley Irrigation Dist.*, 304 Or 151, 161, 742 P2d 1176 (1987) ("Normally, a statute of limitations in a tort action begins to run the instant the claim or cause of action accrues. A cause of action accrues when the party owning it has a right to sue on it."); *T. R.*, 344 Or at 292 (explaining that, along with other requirements of the discovery rule, the statute of limitations will not run until "'all the elements of the tort are present'" (quoting Dan Dobbs, 1 *The Law of Torts, Practitioner Treatise Series* § 218, 554 (2001))).

The city's only argument to the contrary is that plaintiff's federal constitutional claims should be deemed untimely because plaintiff's tort claims are untimely. But plaintiff's tort claims are based on different conduct occurring at a different time. The harmful conduct underlying those claims (*i.e.*, the city's construction of Beverly Terrace) occurred in 2004; the harmful conduct giving rise to the constitutional claims did not occur until 2008. Plaintiff's section 1983 claims, based on the city's actions in 2008, were timely, and that remains true even if plaintiff could have pursued other claims based on other wrongful conduct at an earlier time.

Although the trial court granted summary judgment to the city on plaintiff's section 1983 claims because it concluded that those claims were untimely, the city argues that we should nevertheless affirm the trial court's judgment as to those claims because they fail on the merits. That is, the city asks us to exercise our discretion to affirm the trial court's judgment as right for the wrong reason. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (describing "right for the wrong reason" principle). Specifically, the city argues that plaintiff's common-law right to access his property from the street "is qualified by [the city's] inherent power to protect the public safety, convenience and welfare," plaintiff's access to Beverly Terrace was, in fact, blocked because of public safety concerns, and therefore plaintiff "had no property right" to access Beverly Terrace. As support, the city relies on our cases addressing common-law access rights under Article I,

section 18, of the Oregon Constitution.[9] *See, e.g., Gruner v. Lane County,* 96 Or App 694, 697, 773 P2d 815 (1989) (explaining that an owner of land abutting a street has a common-law right of access to his property from the street, but a governing body has the power to restrict that right for the protection of public safety, convenience, and welfare, and that restriction does not constitute a taking under Article I, section 18, so long as adequate access remains available to the abutting property owner).

To start, we clarify that the city's alternative argument for affirmance—that plaintiff's loss of access is not the loss of a "property right"—only relates to plaintiff's due process claim, not its equal protection claim.[10] With respect to the due process claim, even if we assume that the loss of access to Beverly Terrace is not a taking for which just compensation is due under Article I, section 18, the city does not explain why it necessarily follows that plaintiff lacks a cognizable "protected interest in property" to support a procedural due process claim under the Fourteenth Amendment. *See Goodson v. PERS,* 351 Or 173, 176-77, 264 P3d 148 (2011) (addressing procedural due process claim). Indeed, the city has not mentioned the federal constitutional test on which plaintiff's due process claim turns, let alone tailored its arguments to that test. Given the arguments made to this court with respect to plaintiff's federal constitutional claims, the city has failed to demonstrate that it was entitled to summary judgment on those claims "for a reason other than that upon which the lower court relied." *Outdoor Media Dimensions Inc.,* 331 Or at 660.

Plaintiff finally argues that the trial court erred in concluding that the statute of limitations had run on

---

[9] Article I, section 18, provides, in part, "Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation[.]"

[10] To the extent that plaintiff's equal protection claim relates to the loss of access to Beverly Terrace, that claim is based on the city's disparate treatment of plaintiff as compared to other property owners. The city does not specifically address the equal protection claim, much less explain why that claim could not survive even if plaintiff had no common-law right to access Beverly Terrace. Moreover, as noted, the equal protection claim is broader than the loss of access; plaintiff also claimed that the city failed to respond to its request for a variance while granting those of other property owners.

its inverse condemnation claim under Article I, section 18. Plaintiff alleged that the city, by "construct[ing] Beverly Terrace on [plaintiff's] property in 2004," had taken its property for public use without just compensation. *See Hall v. Dept. of Transportation*, 355 Or 503, 510, 326 P3d 1165 (2014) (explaining that, when the government exercises its eminent domain power to take property for public use without first initiating condemnation proceedings, the property owner can bring an inverse condemnation action to obtain just compensation for that *de facto* taking).

The parties agree that the inverse condemnation claim is subject to a six-year statute of limitations. *See Suess Builders v. City of Beaverton*, 294 Or 254, 268, 656 P2d 306 (1982) (concluding that six-year statute of limitations in ORS 12.080(3) applies to inverse condemnation claim brought under Article I, section 18); ORS 12.080(3) ("An action for waste or trespass upon or for interference with or injury to any interest of another in real property * * * shall be commenced within six years."). Although the parties further agree that the limitations period began when the government took plaintiff's property, they do not agree on when that taking occurred.

Plaintiff argues that the taking occurred when the government physically occupied plaintiff's property in September 2004. *See Hall*, 355 Or at 511 (explaining that a taking results when a governmental actor physically occupies private property). The city counters that the taking "did not await actual physical possession by the city." As support, the city points to cases where the court has recognized a "taking" based on government actions that did not amount to physical occupation. *See id.* at 511-12 (describing the requirements for takings claims based on government regulation and government zoning or planning actions). In the city's view, the statute of limitations began to run on September 9, 2003, when the city council agreed to have its public works department construct Beverly Terrace.

We agree with plaintiff. The taking that plaintiff alleged in its complaint, that plaintiff must prove to prevail on its claim, and that supports plaintiff's claim for damages, is the city's physical occupation of plaintiff's property.

Because that physical occupation occurred in September 2004, within six years of the date plaintiff filed its complaint, plaintiff's inverse condemnation claim was timely.

The city presents no support for its contrary view that a takings claim based on physical occupation accrues before the actual physical occupation. It is true, as the city points out, that property owners may be able to fashion takings claims even if the government does not physically occupy their property. For example, although "government regulation of the use of property or planning for the eventual taking of property for public use that reduces the property's value generally does not result in a *de facto* taking," a property owner can make out a takings claim by showing that the "regulation or planning action deprives the owner of all economically viable use of the property." *Hall*, 355 Or at 522. But that observation is beside the point. It does not follow that, where plaintiff alleged a takings claim based on physical occupation, the statute of limitations began to run at the point when plaintiff *could* have fashioned a takings claim based on a *different* government action that requires *different* evidence of loss. To the contrary, the statute of limitations on plaintiff's takings claim, based on the city's physical occupation of property, began to run when that physical occupation began. Plaintiff's inverse condemnation claim was timely.

Plaintiff's 42 USC section 1983 claims and inverse condemnation claim reversed and remanded; otherwise affirmed.